# EXHIBIT A

DAVID B. HEINTZ                                    April 30, 2019

1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

```
*   *   *   *   *   *   *   *   *   *
                          *  CIVIL ACTION
DAVID HEINTZ               *  NO. 18-00366
                          *
VERSUS                     *
                          *
ARTHUR LAWSON, IN HIS      *  SECTION "G"
INDIVIDUAL CAPACITY AND    *  NANNETTE JOLIVETTE
OFFICIAL CAPACITY AS THE   *  BROWN
CHIEF OF THE GRETNA POLICE *
DEPARTMENT; ANTHONY        *
CHRISTIANA, IN HIS         *
INDIVIDUAL AND OFFICIAL    *  MAGISTRATE "1"
CAPACITY AS THE DEPUTY     *  Hon. Judge Janis
CHIEF OF THE GRETNA POLICE *  van Meerveld
DEPARTMENT AND THE CITY OF *
GRETNA                     *
                          *
*   *   *   *   *   *   *   *   *   *
```

Deposition of DAVID B. HEINTZ, taken on
Tuesday, April 30, 2019, commencing at 9:22
a.m., in the offices of BEEVERS & BEEVERS,
L.L.P., Attorneys at Law, 210 Huey P. Long
Avenue, Gretna, Louisiana 70053.

DAVID B. HEINTZ                                    April 30, 2019

2

1                    I N D E X

2

3                                           Page

4

5        Caption                              1

6        Exhibits                             3

7        Appearances                          6

8        Agreement of Counsel                 7

9

10       Examination

11

12         STEVEN M. MAUTERER                 8

13         CHARLOTTE C. Mc DANIEL McGEHEE    175

14

15                    *    *    *    *    *

16

17       Witness' Certificate              180

18       Reporter's Page                   181

19       Certificate                       182

20

21

22

23

24

25

DAVID B. HEINTZ                              April 30, 2019

3

1    EXHIBITS:

2       Heintz No. 1                          13
           Complaint for Declaratory Relief
3          and Damages

4       Heintz No. 2                          14
           Supplemental and Amended Complaint
5          for Declaratory Relief and Damages

6       Heintz No. 3                          18
           Memorandum to Sergeant David Heintz
7          From Anthony H. Christiana, Jr., Dated
           November 7, 2016
8          RE:  Disciplinary Action
           Bates No. GPD_Heintz:0326
9
        Heintz No. 4                          69
10         Declaration of David Brian Heintz
           Bates No. D.Heintz000070 to -000079
11
        Heintz No. 5                          90
12         Memorandum to All Personnel from
           Anthony H. Christiana, Jr., Dated
13         August 26, 2016
           RE:  Transfer
14         Bates No. D.Heintz000374
15      Heintz No. 6                          92
           Memorandum to Sergeant David Heintz
16         From Deputy Chief Anthony H. Christiana,
           Jr., Dated September 1, 2016
17         REF:  Administrative Leave
           Bates No. D.Heintz000370
18
        Heintz No. 7                          94
19         Administrative & Personnel
           Management Report
20         Gretna Police Department
21      Heintz No. 8                          98
           Memorandum to Sergeant David Heintz
22         From Arthur S. Lawson, Jr., Dated
           September 22, 2016
23         RE:  Administrative Leave

24

25

DAVID B. HEINTZ                              April 30, 2019

4

1    EXHIBITS:   (Continued)

2       Heintz No. 9                          100
           Memorandum to Chief Arthur S. Lawson, Jr.
3          and Deputy Chief Anthony Christiana
           From Sergeant Tris P. Lear
4          Dated September 27, 2016
           RE:  Sergeant David Heintz - Reinstatement
5          Bates No. GPD_Heintz:0398

6       Heintz No. 10                         103
           Memorandum to Chief Arthur Lawson
7          From Sergeant David Heintz
           Dated January 5, 2017
8          RE:  Letter of resignation

9       Heintz No. 11                         104
           Plaintiff's Responses to Defendants'
10         First Set of Interrogatories

11      Heintz No. 12                         104
           Gretna Police Department
12         Performance Appraisal
           Semi-Annual Evaluation, Section I
13         OFC Daniel Swear
           Dated December 30, 2014
14         Bates No. D.Heintz000029 to -000035

15      Heintz No. 13                         108
           Gretna Police Department
16         Performance Appraisal
           Semi-Annual Evaluation, Section I
17         Sgt. Dave Heintz
           Dated January 1, 2016
18         Bates No. D.Heintz000387 to -000392

19      Heintz No. 14                         119
           Gretna Police Department
20         Performance Appraisal
           Cover Sheet
21         Section II Patrol Division
           Dated January 1, 2016
22         Bates No. D.Heintz000394 to -000401

23      Heintz No. 15                         135
           Paycheck Stubs for February 25, 2016
24         to January 20, 2017
           Bates No. GPD_Heintz:0648 to -0673

25

DAVID B. HEINTZ                                        April 30, 2019

5

1    EXHIBITS:  (Continued)

2      Heintz No. 16                        145
         Application for Employment
3        Jefferson Parish Sheriff's Office
         Bates No. GPD_Heintz:453 to -456
4
       Heintz No. 17                        146
5        Handwritten Statement dated 11/17/16
         Bates No. GPD_Heintz:457
6
       Heintz No. 18                        151
7        41st Judicial District Court
         Petition Insuit for Damages for
8        Personal Injury

9      Heintz No. 19                        155
         Conditional Offer of Employment
10       Bates No. GPD_Heintz:461

11     Heintz No. 20                        156
         2017 Year-to-Date Payroll Records
12       with the Jefferson Parish Sheriff's
         Office
13       Bates No. GPD_Heintz:621 to -638

14     Heintz No. 21                        157
         U.S. Individual Income Tax Return 2016
15       Bates No. D.Heintz000319 to -000326

16     Heintz No. 22                        159
         U.S. Individual Income Tax Return 2017
17       Bates No. D.Heintz000349 to -000356

18     Heintz No. 23                        161
         Detail Listing for Selected Employee
19       101055 - Heintz, David
         01/01/2017 to 12/31/2017
20       Bates No. GPD_Heintz:639 to -642

21     Heintz No. 24                        168
         Records from Tim Kemery, LCSW
22       Bates No. GPD_Heintz:0441 to - 0448

23

24

25

DAVID B. HEINTZ                                    April 30, 2019

                                                              6

1    APPEARANCES:

2       Representing David Heintz:

3          CHARLOTTE C. McDANIEL McGEHEE
           Attorneys at Law
4          16851 Jefferson Highway
           Suite 6-B
5          Baton Rouge, Louisiana 70808

6          BY:  CHARLOTTE C. McDANIEL McGEHEE

7


8
        Representing Arthur Lawson, Anthony Christiana
9       and The City of Gretna:

10         BEEVERS & BEEVERS, L.L.P.
           Attorneys at Law
11         210 Huey P. Long Avenue
           Gretna, Louisiana 70053
12
           BY:  STEVEN M. MAUTERER
13

14
     ALSO PRESENT:
15      Lt. Tris Lear

16

17

18

19

20

21

22

23   Reported by:
                    KATHRYN L. KOVACEVICH
24                  Certified Court Reporter
                    Registered Professional Reporter
25                  State of Louisiana

DAVID B. HEINTZ                                    April 30, 2019

7

1              S T I P U L A T I O N

2

3          It is stipulated and agreed by and between

4     counsel that the deposition of DAVID B. HEINTZ

5     is hereby being taken under the Federal Rules of

6     Civil Procedure in accordance with the Rules.

7          The formalities of sealing and

8     certification are hereby waived.  The witness

9     reserves the right to read and sign the

10    deposition.  The party responsible for service

11    of the discovery material shall retain the

12    original.

13         All objections are to be made in

14    accordance with the Federal Rules of Civil

15    Procedure.

16                   *   *   *   *   *

17         KATHRYN L. KOVACEVICH, Certified Court

18    Reporter, Registered Professional Reporter, in

19    and for the State of Louisiana, officiated in

20    administering the oath to the witness.

21

22

23

24

25

DAVID B. HEINTZ                                April 30, 2019

8

1          DAVID B. HEINTZ, 121 CREAGAN AVENUE,

2     GRETNA, LOUISIANA 70053, after having been first

3     duly sworn, testified on his oath as follows:

4     EXAMINATION BY MR. MAUTERER:

5          Q.  Good morning, Mr. Heintz.  How are you

6     doing?

7          A.  Good.

8          Q.  We haven't met.  My name is Steve

9     Mauterer.  I represent the City of Gretna,

10    Arthur Lawson, and Deputy Chief Christiana in a

11    lawsuit that you brought against them.

12          A few rules that we have this morning.

13    Everything that goes on in this room is being

14    taken down by the court reporter.  So when I ask

15    questions and you give me a response, she would

16    appreciate it greatly if you do it out loud.

17          Do you understand?

18          A.  Correct.

19          Q.  If there is a question that I ask you

20    that you don't understand for some reason,

21    lawyers sometimes ask very poor questions,

22    please stop me, tell me you don't understand,

23    tell me to rephrase it.  I take no offense.

24          Do you understand that so far?

25          A.  Yes.

DAVID B. HEINTZ                              April 30, 2019

9

1      Q.  If you answer a question, though, I'm

2  going to assume that you understood it; and you

3  gave me the answer as you understood.  All

4  right?

5      A.  Right.

6      Q.  If you have to take a break for any

7  reason, you've got to answer the phone, you've

8  got to go to the bathroom, whatever, you want

9  some coffee, that's behind you, as long as there

10  is not a question pending to you, just let us

11  know that you need to take a break.

12         Do you understand?

13      A.  Yes.

14      Q.  And as your Counsel has said off the

15  record, at about 10:00 o'clock she has to have a

16  telephone conference in another matter.  So at

17  least by 10:00 o'clock, we're going to take a

18  break for her.  All right?

19      A.  Okay.

20      Q.  Other than discussions that you have had

21  with your lawyers or any documents that you

22  reviewed with your lawyers, what, if anything,

23  did you do to prepare for this deposition?

24      A.  I looked over some of my notes that I

25  had.

DAVID B. HEINTZ                              April 30, 2019

                                                        10

 1        Q.   These are notes that you looked at

 2   yourself and not in the presence of your

 3   attorney?

 4        A.   Correct.

 5        Q.   What notes are those?

 6        A.   Whatever was filed through the Court.

 7        Q.   So I want to make sure I understand.

 8   When you say "notes," are you talking about

 9   handwritten notes that you took down; or

10   actually copies of pleadings that are filed in

11   your case?

12        A.   The pleadings that were filed in the

13   case.

14        Q.   Do you recall which pleadings you looked

15   at?

16        A.   The original filing and the amended

17   filing.  That's it.

18        Q.   That's it?

19        A.   Yes.

20        Q.   Tell me a little bit about yourself.

21   Where were you educated?

22        A.   High school?

23        Q.   Yeah.

24        A.   West Jefferson.

25        Q.   Did you go to college?

DAVID B. HEINTZ                              April 30, 2019

                                                              11

1         A.   No.

2         Q.   As I understand it, you originally

3    started your law enforcement career -- you went

4    to Gretna Police Academy; isn't that true?

5         A.   Yes.

6         Q.   Then you were in the reserves at Gretna

7    for a little while?

8         A.   About two years.

9         Q.   And then you went over to JPSO, the

10   sheriff's office; right?

11        A.   Right.

12        Q.   How long were you there?

13        A.   13 years.

14        Q.   Then you decided to leave and you

15   applied with Gretna Police Department?

16        A.   Yes.

17        Q.   What rank, if any, did you have when you

18   started with Gretna Police Department?

19        A.   When I came over, I was an officer first

20   class.

21        Q.   As I understand it, within two years you

22   were promoted to sergeant at Gretna Police

23   Department; isn't that correct?

24        A.   Correct.

25        Q.   You stayed with Gretna until January of

DAVID B. HEINTZ                              April 30, 2019

                                                        12

1    2017 when you went to Jefferson Parish Sheriff's

2    Office; isn't that correct?

3        A.  Correct.

4        Q.  During your entire tenure with Gretna

5    Police Department, you maintained the rank of

6    sergeant; isn't that true?

7            MS. McDANIEL McGEHEE:

8            I'm going to object to the form of the

9    question.

10           THE WITNESS:

11           No.

12   BY MR. MAUTERER:

13       Q.  At any point in time while you were a

14   Gretna police officer from -- let's say when you

15   came as a full-time officer from JPSO, you were

16   a sergeant.  Wasn't that true?

17       A.  No.

18       Q.  What other ranks did you hold?

19       A.  I was officer first class.  I think I

20   was able to skip senior patrol and went to

21   master patrol, because they gave me credit for

22   my time from JP.  And in order to move up, you

23   had to do two physical assessments, which is

24   every six months; and I wasn't able to move up

25   until I did those two.  So after my first year,

DAVID B. HEINTZ                                    April 30, 2019

                                                              13

1      they bumped me up to, I believe, it was master

2      patrol.  And then I was promoted to the rank of

3      sergeant after that.

4           Q.  So after a year of employment with

5      Gretna Police Department, you were promoted to

6      master patrol officer; correct?

7           A.  I believe it was.

8           Q.  All right.  And then a year after that

9      you became a sergeant; right?

10          A.  Correct.

11          Q.  From that period until the time you

12     left, you were a sergeant; correct?

13          A.  Correct.

14          Q.  Now, you have filed a lawsuit against

15     the City of Gretna.  I'm going to mark this

16     Original Complaint as Heintz Number 1.  It's

17     filed January 11th, 2018.

18              This is the original complaint that you

19     filed; correct?

20              MS. McDANIEL McGEHEE:

21              Object to the form of the question.

22     BY MR. MAUTERER:

23          Q.  You can answer.

24          A.  It appears to be.

25          Q.  Then you said that you had reviewed a

DAVID B. HEINTZ                                    April 30, 2019

                                                                14
1    supplemental complaint in preparation for this

2    deposition; right?

3        A.   Correct.

4        Q.   I'm going to show you what I'm marking

5    as Heintz 2 and ask you if this is the

6    Supplemental Petition that you reviewed?

7        A.   Yes.

8        Q.   All right.  We'll go through these two

9    petitions or these two complaints together and

10   ask you some questions, Mr. Heintz.

11           If you look in the supplemental

12   complaint, that's Heintz 2, Paragraph 10 of your

13   original complaint has been amended, so I want

14   to start looking at your supplemental complaint.

15           If you look at Paragraph 2 on the first

16   page -- I know it gets confusing.

17       A.   All right.  I got it.

18       Q.   Paragraph 2 on the first page says,

19   Paragraph 10 of the original complaint is

20   amended.

21           Are you with me?

22       A.   Okay.

23       Q.   It says, I separated from my employment

24   with the Gretna Police Department because of the

25   continuous and escalating conduct of the

DAVID B. HEINTZ                                    April 30, 2019

                                                              15

 1    defendant which culminated in a meeting I

 2    attended with Chief of Police defendant Arthur

 3    Lawson, and Deputy Chief defendant Anthony

 4    Christiana, where I was advised by the Deputy

 5    Chief at the direction of the Chief that any

 6    infraction lodged against me would lead to

 7    immediate termination of my employment.  This

 8    action was taken against me by the Chief and

 9    Deputy Chief because I spoke out against the

10    Gretna Police Department's unlawful quota

11    system, police brutality, and internal

12    impropriety.

13          Do you see that?

14      A.  Yes, sir.

15      Q.  My questions are, where did this meeting

16    take place?

17      A.  In one of their offices.  Honestly, I

18    don't know which office was the Chief's and

19    which one was the Deputy Chief.

20      Q.  So what year did it take place in?

21      A.  2016.

22      Q.  Were they in the new building in 2016?

23      A.  Yes.

24      Q.  What floor were they on?

25      A.  It's been a while since I've been in the

DAVID B. HEINTZ                                    April 30, 2019

16

1  building.  I don't remember.  They call it the

2  palace.  I don't know.

3       Q.  They call what the palace?

4       A.  The palace.

5       Q.  I heard you.  I'm just trying to

6  understand.

7            What did they call the palace?

8       A.  The Chief's office.  The Chief, Deputy

9  Chief, and, I think, Captain Jackson is in that

10 office on that floor.

11      Q.  So if you walk in the door to the Chief

12 and Deputy Chief's office --

13      A.  Right.

14      Q.  -- how many offices are in there?

15      A.  I don't know.  I've been in that office

16 maybe three times in that section.  Like I said,

17 the secretaries are there; and then they had

18 closed doors.  So --

19      Q.  Did you go to the left or to the right?

20      A.  To the left.

21      Q.  You said in 2016.  Do you remember a

22 month in 2016?

23      A.  Not offhand.

24      Q.  Was it the beginning of the year or the

25 end of the year --

DAVID B. HEINTZ                          April 30, 2019

                                                        17

1        A.   No, it was the end.

2        Q.   The end of the year?

3             MS. McDANIEL McGEHEE:

4             Let him ask the whole question before

5    you answer.

6             THE WITNESS:

7             I'm sorry.

8    BY MR. MAUTERER:

9        Q.   Was it before you applied to Jefferson

10   Parish Sheriff's Office?

11       A.   Yes.

12       Q.   Was it before Christmas?

13       A.   Yes.

14       Q.   Was it before New Year's?

15       A.   Yes.

16       Q.   Obviously.  Before Thanksgiving?

17       A.   Yes.

18       Q.   In the office to the left that you went

19   in, where did the Chief of Police sit?

20       A.   To my right in a chair.

21       Q.   There's chairs in front of the desk?

22       A.   There's two chairs.  The Chief was to my

23   right, and the Deputy Chief was behind the desk.

24       Q.   Who was doing the talking during that

25   meeting, the Chief or the Deputy Chief?

DAVID B. HEINTZ                          April 30, 2019

18

1        A.   Both.   The Deputy Chief held the papers

2    in his hand and read word-for-word off the

3    documents, and then the Chief had a few words.

4        Q.   Could you see which documents the Deputy

5    Chief was reading from?

6        A.   He gave me a copy when he finished.

7        Q.   What was the document that he read from

8    and he gave you?

9        A.   It was a --

10            MS. McDANIEL McGEHEE:

11            I'm going to object to the form of the

12   question.

13            You can answer.   I'm sorry, go ahead.

14            THE WITNESS:

15            It was a policy violation saying that I

16   violated policy for unsatisfactory performance,

17   and that I was being suspended for two days and

18   placed on probation for a year.

19   BY MR. MAUTERER:

20       Q.   I'm going to show you what I'm marking

21   as Heintz 3, and ask you if this is a copy of

22   the document that you are referring to?

23       A.   Yes, sir.

24       Q.   Just so I understand your testimony --

25   first of all, this document, Heintz 3, is dated

DAVID B. HEINTZ                          April 30, 2019

19

1    November 7th, 2016.

2           Does that refresh your memory at all as

3    to the date of the meeting that you're talking

4    about?

5           A.   Yes.

6           Q.   Does that date sound correct?

7           A.   Yes.

8           Q.   So during the meeting on November 7th,

9    2016, you're saying the Chief and the Deputy

10   Chief met with you and had discussions; and at

11   the end of the meeting, Heintz 3 was handed to

12   you; right?

13          A.   Yes.

14          Q.   What did the Chief say during this

15   meeting?

16          A.   Just that he stood by this and then he

17   asked Deputy Chief Christiana to give us a few

18   minutes and me and the Chief spoke privately.

19          Q.   So at some point in time, the Deputy

20   Chief walked out of the office?

21          A.   Correct.

22          Q.   And there was a private meeting where

23   only you and the Chief were?

24          A.   Correct.

25          Q.   What did the Chief tell you during that

DAVID B. HEINTZ                                April 30, 2019

                                                            20

1    private meeting?

2         A.   That he was upset because of the way he

3    found out about the Rob Wallow incident.  He

4    then said that because of some allegations that

5    I made against the Deputy Chief about deleting

6    videos prior to and other things, that those

7    were investigated and there was no truth to

8    them.  And that -- he told me that he saw

9    potential in me, and that he just wanted me to

10   go back to work.

11        Q.   This letter November 7th, 2016 decision

12   that found you in violation of unsatisfactory

13   performance by a member, this didn't have

14   anything to do with the Rob Wallow incident; did

15   it?

16        A.   It was retaliation for it, I believe.

17        Q.   This had to do with you having incorrect

18   or inaccurate trip sheets; isn't that true?

19        A.   Which only came to light after I spoke

20   out against watching a policeman kick a guy in

21   handcuffs.

22        Q.   But the investigation that resulted in

23   this determination was because you submitted

24   inaccurate trip sheets; right?

25             MS. McDANIEL McGEHEE:

DAVID B. HEINTZ                              April 30, 2019

                                                              21

1            Object to the form.  Asked and

2       answered.

3       BY MR. MAUTERER:

4            Q.  You can still answer.

5               MS. McDANIEL McGEHEE:

6               You can answer again.

7               THE WITNESS:

8               I was told that this investigation was

9       opened by Mr. Lear.  When he brought me in there

10      he said, You opened a can of worms.  Scott

11      Vinson and Dean Champagne pulled your GPS and

12      trip sheets and he had a stack of files about

13      this (indicating) thick and said I had to go

14      through all of this to find this mistake in your

15      trip sheet.

16      BY MR. MAUTERER:

17           Q.  So your testimony today as I'm

18      understanding is, Lieutenant Lear advised you

19      that you opened up a can of worms?

20           A.  Yes.

21           Q.  Are you saying today that you did not

22      submit inaccurate trip sheets?

23           A.  It was an honest mistake.  Yes, I did.

24      And I owned up to it that day and told the Chief

25      it was an honest mistake.  I'm human.

DAVID B. HEINTZ                           April 30, 2019

                                                        22

1        Q.  Didn't you also not approve tickets

2   while Lieutenant Champagne was on vacation?

3            MS. McDANIEL McGEHEE:

4            I don't understand.  I'm going to

5   object to the form of the question.  It's not in

6   a question form.  And I don't understand what

7   you're asking.

8   BY MR. MAUTERER:

9        Q.  Lieutenant Champagne went on vacation in

10  August of 2015; correct?

11       A.  Okay.

12       Q.  He was your lieutenant during that time;

13  right?

14       A.  Correct.

15       Q.  You were his sergeant; right?

16       A.  Correct.

17       Q.  With the lieutenant not there, if any

18  officers wrote tickets during the time that the

19  lieutenant was gone, it was the sergeant's duty

20  to review and approve the tickets with the

21  DigiTicket program that the Gretna police uses;

22  right?

23       A.  Correct.

24       Q.  And during the time that the lieutenant

25  was on vacation, you did not review and approve

DAVID B. HEINTZ                           April 30, 2019

                                                              23

1    tickets on the DigiTicket system; right?

2         A.   No.

3         Q.   You did?

4         A.   I did.  Can I explain this?

5         Q.   How did you approve -- review and

6    approve them?

7         A.   Okay.  Lieutenant Champagne approached

8    me and asked me, he said that he was told I

9    didn't approve the Digi Tickets.  I told him I

10   did.  Because as a matter of fact, I had Rob

11   Wallow's tickets printed -- unapproved tickets

12   printed out and highlighted in the bin.

13          So when Lieutenant Champagne approached

14   me and said you didn't approve them, I said, I'm

15   telling you I did, because there's unapproved

16   ones that Rob Wallow had and some other

17   officers.  And he started to write me up.  And I

18   said, I'm not signing off on this, because I

19   don't believe I did anything wrong.  If you

20   present proof that I did not log into that

21   system and approve these reports during that

22   time, I will sign off on it; and you can do

23   whatever you need to do to me.  He never got

24   back with me.

25          So I believe I checked all the tickets.

DAVID B. HEINTZ                                    April 30, 2019

24

1    And like I said, I know for a fact that Rob

2    Wallow had unapproved citations highlighted in

3    there to fix.

4        Q.  Are you aware if at some point in time

5    the Gretna Police Department obtained proof from

6    DigiTicket that proves that you didn't log into

7    the program and approve tickets during that

8    time?

9            MS. McDANIEL McGEHEE:

10           Object to the form.

11           He asked if you're aware.

12           THE WITNESS:

13           No.

14   BY MR. MAUTERER:

15       Q.  Now, this meeting that you and the

16   Deputy Chief and Chief had on November 7th, as

17   you have stated, what time of day was it?

18       A.  I don't recall.

19       Q.  You don't remember if it was morning or

20   afternoon?

21       A.  No.

22       Q.  Were you working that day?

23       A.  I don't know.

24       Q.  When you were a patrol sergeant, you

25   worked nights; correct?

DAVID B. HEINTZ                           April 30, 2019

25

1         A.   Correct.

2         Q.   Were you in uniform when you had this

3    meeting with the Chief and Deputy Chief?

4         A.   If I was working, I should have been.

5         Q.   That's what I'm trying to get at.  Do

6    you remember if you were in uniform?

7         A.   I don't remember.

8         Q.   Now, you said when you went in to the

9    office -- you called it the palace -- and you

10   said the secretaries are to your right and left?

11        A.   Right.

12        Q.   Were there any secretaries there at that

13   time?

14        A.   I know Tracy Haas was there.

15        Q.   Anyone else?

16        A.   I don't recall.

17        Q.   Now, your statement in the complaint,

18   Paragraph 10 that we just read, it says, You

19   were advised by the Deputy Chief at the

20   direction of the Chief that any infraction

21   lodged against me would lead to immediate

22   termination of my employment.

23             Do you see that?

24        A.   Yes.

25        Q.   Now, the letter that you've identified

DAVID B. HEINTZ                                    April 30, 2019

                                                              26

1    as being provided to you, and has been marked as

2    Heintz 3, at the end it says, Any incidents that

3    may occur and you are found in further violation

4    of departmental regulations, further

5    disciplinary action can occur up to and

6    including termination.

7            Do you see that?

8        A.  Yes, sir.

9        Q.  That doesn't say you do one -- you

10   commit one more violation and you will be fired;

11   does it?

12           MS. McDANIEL McGEHEE:

13           I'm going to object to the form of the

14   question.

15           THE WITNESS:

16           Can you ask the question again?

17   BY MR. MAUTERER:

18       Q.  Sure.  The statement, Any incidents that

19   may occur and you are found in further violation

20   of departmental regulations, further

21   disciplinary action can occur up to and

22   including termination.

23           That statement does not say if you

24   commit another violation of departmental

25   regulations you will be fired?

DAVID B. HEINTZ                          April 30, 2019

27

1        A.  It doesn't say --

2              MS. McDANIEL McGEHEE:

3              I don't understand.  I'm going to

4      object to the form of the question.  It's not

5      actually a question.

6              MR. MAUTERER:

7              It is a question.

8    BY MR. MAUTERER:

9        Q.  That statement does not say that if you

10     commit another departmental regulation you will

11     be terminated; does it?

12       A.  It doesn't say that there.  But after he

13     read it, he looked at me and said, You

14     understand any infraction you will be

15     terminated.

16       Q.  And he is who?

17       A.  Anthony Christiana.

18       Q.  When Anthony, according to you, said

19     those words, the Chief was still in the room;

20     right?

21       A.  Correct.

22       Q.  How long did this meeting take place,

23     Mr. Heintz?

24       A.  Maybe 30 minutes.

25       Q.  If you look at -- and I apologize, I'm

DAVID B. HEINTZ                                    April 30, 2019

                                                              28

1    switching back and forth -- but your complaint

2    has been amended.

3         A.   Right.

4         Q.   So I'm going to direct you to the

5    particular one that I want you to look at.

6              If you look at your original complaint,

7    that's Heintz 1, Paragraph 12, it says, An

8    arrest and citation quota system has been in

9    place with the Gretna Police Department since at

10   least 2007.

11             Do you see that?

12        A.   Yes, sir.

13        Q.   How do you know that?

14        A.   In 2007, I went to day watch.  I worked

15   for Lieutenant Jarvis Jackson.  When I went to

16   day watch, he briefed me on his expectations for

17   the shift.  He told me he expected two citations

18   for every day that we worked.  He said it wasn't

19   that hard to get.

20        Q.   Anything else?

21        A.   Sure.  Later on that year, I fell short

22   of my two citations for the day; and I was

23   brought into Lieutenant Jackson's office.  He

24   gave me a write-up saying unsatisfactory

25   performance.  He said, I failed to meet my quota

DAVID B. HEINTZ                                    April 30, 2019

29

1    for the month and that he was truly disappointed

2    in me.  And he said, It's not that hard of a

3    goal to reach.  And my response was, Look, I

4    just came back from JP.  I'm not here to make

5    money for the city.  I'm here to put bad guys in

6    jail.  I said, I'm leading the shift in arrests.

7    I've got more narcotic arrests, things like

8    that.  He told me, That's great.  Narcotics go

9    to 24th Judicial, not Gretna.  We don't get any

10   money from that.

11           So I took my piece of paper, my

12   write-up, made a copy, kept one at my house,

13   kept one in my car.  We did trip sheets

14   manually.  I kept my notebook, every call for

15   service I had.  The next month comes around,

16   every citation I wrote, check, check.  If I

17   wrote five, put a swipe through it.  When I got

18   to short of two citations, I quit writing

19   tickets.  I wanted to see if it would happen

20   again.

21           Sure enough, Dave, come see.  I go sit

22   in Lieutenant Jackson's office, another

23   write-up.  He said, Man, I just don't understand

24   what you don't get.  I said, I don't understand

25   what you don't get.  Let me have it.  So sure

DAVID B. HEINTZ                                    April 30, 2019

30

1    enough, he gives it to me.  I go to the copy

2    machine, make my copy, one in my car.  Get the

3    other one that I had in my car, I go see

4    Lieutenant Marty Schmidt, who is in charge of

5    IAD.  I said, Lieutenant, I'm pretty sure quotas

6    are illegal in Louisiana.  What do you think of

7    this?  His response was, Oh, shit.  He goes, Are

8    you serious?  Yes, sir, in black and white.  I'm

9    not the only one.

10         He took the two copies that I gave him.

11   He said, It's taken care of.  It won't happen

12   again.  That was it.

13        Q.  You said that you received two

14   write-ups; right?

15        A.  Correct.

16        Q.  And both write-ups you made two copies

17   of; right?

18        A.  I made one copy.  Well, a copy of each.

19        Q.  I misunderstood.  Let me go back.  I

20   thought you said you made a copy and kept one at

21   your house and one in your car.  That would be

22   two copies.

23        Did I misunderstand?

24        A.  No.  He gave me one.  So I make one

25   copy.  I take my original in my car.  One copy

DAVID B. HEINTZ                                    April 30, 2019

31

1    at my house.

2         Q.   So you should have two -- you had two

3    copies.   Two pieces of paper; right?

4         A.   Right.

5         Q.   Do you have those today?

6         A.   I can't find them.

7         Q.   Neither one of those write-ups?

8         A.   No.

9         Q.   Now, you said when you spoke with Marty

10   Schmidt, I think, it was --

11        A.   Yes.

12        Q.   -- that the comment, according to you,

13   was, You're not the only one.

14             Did I hear you say that?

15        A.   Correct.   There was two other officers

16   on my shift that got written up.

17        Q.   Who was that?

18        A.   Roy Broderick and Amy Sporandio.

19        Q.   Any other officers in 2007 got written

20   up for not following this quota?

21        A.   I don't know.

22             MS. McDANIEL McGEHEE:

23             I'm going to object to the form of the

24   question.

25   BY MR. MAUTERER:

DAVID B. HEINTZ                                April 30, 2019

                                                        32

1        Q.   Did you go to the Deputy Chief of Police

2    at the time and talk to him about this quota?

3        A.   No.

4        Q.   Did you go to the Chief of Police at the

5    time and talk to him and tell him, Chief, did

6    you know you had a quota?

7        A.   No.

8        Q.   Did you talk to the two officers that

9    you just named about, Hey, did you know we have

10   a quota?

11       A.   Yes.   That's how I know they got written

12   up, because we all got together and shared

13   copies of papers.

14       Q.   Do you have copies of their write-ups?

15       A.   No.

16       Q.   Now, I want to make sure I understand.

17   Both of these write-ups as you're describing to

18   me, those happened in 2007; right?

19       A.   Correct.

20       Q.   So according to your testimony, after

21   you received two write-ups for not following a

22   quota, the year after you were promoted to

23   sergeant; weren't you?

24       A.   Yes.

25       Q.   Look at Paragraph 17 of your original

DAVID B. HEINTZ                                    April 30, 2019

                                                              33

1    complaint, Mr. Heintz?

2         A.  (Witness complying.)

3         Q.  It says, The quota system required

4    patrol officers to issue a specified amount of

5    citations and arrests per 12-hour shift.

6            Do you see that?

7         A.  Yes.

8         Q.  Is that talking about this 2007 quota,

9    or is it talking about another one?

10        A.  The quota has been there before I came

11   back in 2006.

12        Q.  So what is the specified amount of

13   citations of arrests per 12-hour shift?

14        A.  10, 2, and 2 is from -- I've talked to

15   patrolmen that were there before me; and it's

16   always been 10, 2, and 2.  Average of 10 items,

17   2 arrests, and 2 citations for every shift you

18   worked.

19        Q.  What officers did you talk to that were

20   there before you to confirm this quota?

21           Who did you talk to?

22            MS. McDANIEL McGEHEE:

23            I'm going to object to the form of the

24   question.  You're not letting the Deponent

25   answer the first question before you lodge a

DAVID B. HEINTZ                                April 30, 2019

34

1    second question.

2            I think the question is, Who did you

3    speak to about 10, 2, and 2.

4            Prior to his employment, is that when

5    it was?

6            MR. MAUTERER:

7            No.

8            MS. McDANIEL McGEHEE:

9            Sorry.

10   BY MR. MAUTERER:

11       Q.  He stated that he had spoken to officers

12   that had been there in the past.

13           Isn't that what you said?

14       A.  Right.

15       Q.  Who were they?

16       A.  I -- I'm --

17           MS. McDANIEL McGEHEE:

18           If you remember, tell him.

19           THE WITNESS:

20           I do.  But the problem is that,

21   unfortunately, a lot of people aren't civil

22   service; and I'm afraid to put it out there,

23   because if they get caught up, they could lose

24   their job, you know.

25   BY MR. MAUTERER:

DAVID B. HEINTZ                              April 30, 2019

35

1        Q.   Well, you've said that you spoke to

2    people.   I'm entitled to know who you spoke to.

3    So do you remember --

4              MS. McDANIEL McGEHEE:

5              That's not what he said.   I'm going to

6    object to the form of the question.   He said he

7    spoke to officers who had previously been

8    employed there.   Not people, but officers.

9    BY MR. MAUTERER:

10       Q.   You spoke to officers previously

11   employed by Gretna Police Department.   You spoke

12   to them about this quota.   I'm entitle to know

13   their names.

14       A.   Okay.

15       Q.   Please tell me what their names are?

16       A.   Thomas Gray.

17       Q.   Who else?

18       A.   Gary Gegenheimer.   That's all I can

19   think of.

20       Q.   Do you remember when you spoke to Thomas

21   Gray?

22       A.   At a barbershop.   I don't remember when

23   it was.   It was maybe a year-and-a-half ago,

24   after I had left Gretna.   And his comment was,

25   Everybody knows.   It's been like that.   He said,

DAVID B. HEINTZ                                    April 30, 2019

                                                                36
 1    When I went through FTO training, I don't know

 2    if he went '03 or '04, it was always 10, 2, and

 3    2.

 4         Q.  Gary Gegenheimer, when did you talk to

 5    him?

 6         A.  I talk to him every now and then.  I

 7    don't remember.  I don't remember a date --

 8         Q.  Was it after you left?

 9             MS. McDANIEL McGEHEE:

10             I'm going to object to the form of the

11    question.  I'm going to ask that the questions

12    be lodged after his answer is complete.  I think

13    you were trying to cut him off during the middle

14    of his attempt to answer your other question.

15             You can answer the question.

16             THE WITNESS:

17             What was the question?

18    BY MR. MAUTERER:

19         Q.  Was it after you left?

20         A.  I spoke to him after that, yes.

21         Q.  Did this conversation that you had with

22    Gary Gegenheimer where he revealed to you that

23    there's always been a 10, 2, and 2 quota at the

24    Gretna Police Department occur after you left?

25         A.  Yes.

DAVID B. HEINTZ                                    April 30, 2019

37

1          Can I add something to it?  No, never
2     mind.  I'll stop.
3          Q.  Now, my question earlier was, when you
4     were written up in 2007, did you go to the
5     Deputy Chief or Chief at the time and talk about
6     a quota.
7              The question now is, between 2007 and
8     the time that you left, did you go to the Deputy
9     Chief and talk to him about a quota?
10         A.  I did the morning that he called me into
11    his office in August, when they were doing the,
12    I guess, depositions or preparing for the Daniel
13    Swear suit.
14         Q.  So in August, whenever you gave a
15    statement in connection with the Daniel Swear
16    suit, was the first time that you told or had a
17    conversation with the Deputy Chief regarding a
18    quota?
19         A.  Yes.
20         Q.  After 2007 when we just spoke to the
21    time that you left, did you ever tell the Chief
22    that there was a quota at the Gretna Police
23    Department?
24         A.  No.
25         Q.  Do you know when Thomas Gray left the

DAVID B. HEINTZ                              April 30, 2019

                                                              38
1    Gretna Police Department?

2        A.   No.

3        Q.   Do you know why he left the Gretna

4    Police Department?

5        A.   No.

6        Q.   Do you know when Gary Gegenheimer left

7    the Gretna Police Department?

8        A.   No.

9        Q.   Do you know why he left the Gretna

10   Police Department?

11       A.   To pursue a career as a firefighter.

12       Q.   Now, looking at your original complaint,

13   Mr. Heintz, Paragraph 22?

14       A.   (Witness complying.)

15       Q.   Excuse me, that one is amended.  So we

16   need to go to your supplemental complaint,

17   Paragraph 22.  It's actually Paragraph 3.

18            It says Paragraph 22 of the original

19   complaint is amended.

20       A.   Okay.

21       Q.   All right.  It says, In December 2014, I

22   attended a meeting where the Captain of the

23   Patrol Division personally addressed the patrol

24   team I supervised and expressly mandated

25   adherence and compliance with the departmental

DAVID B. HEINTZ                          April 30, 2019

39

1    quota system.  The Captain expressly stated that

2    this mandate and directive came from the Chief.

3            Do you see that?

4    A.  Yes.

5    Q.  Tell me in your words how this

6    conversation allegedly took place.

7            MS. McDANIEL McGEHEE:

8            I'm going object to the form of the

9    question.  It's not a conversation.  It says

10   it's a meeting.

11   BY MR. MAUTERER:

12   Q.  What did the Captain of the Patrol

13   Division tell you during this meeting?

14   A.  He told the shift that there was a

15   possibility we were going to lose the Red Flex

16   speed cameras; and that if we did lose them, we

17   would pay more for our health insurance and

18   benefits.  We were looking at losing about a

19   million dollars out of the Red Flex funds, and

20   that we needed to produce more revenue to keep

21   us from paying for our own insurance.  Which the

22   only way to produce more revenue is more

23   citations and more arrests.

24   Q.  Did he say anything else?

25   A.  He said that he would continue to

DAVID B. HEINTZ                          April 30, 2019

40

1     monitor the supervisors; and if we didn't adhere

2     to the increase in performance, the supervisors

3     would be disciplined for it.

4          Q.   Anything else that he said?

5          A.   I don't recall.

6          Q.   Between 2007 and 2014, you were still

7     employed with Gretna Police Department; right?

8          A.   Correct.

9          Q.   All right.  Now between that time

10    period, 2007 and this meeting in December of

11    2014, other than the two individuals that you

12    previously told me, are you aware of any other

13    officer ever being disciplined for not following

14    the quota?

15         A.   I'm not aware of any.

16         Q.   Are you aware of any supervisor that was

17    disciplined for not having their officers follow

18    the quota between 2007 and 2014?

19              MS. McDANIEL McGEHEE:

20              Including himself?

21              I'm going to object to the form of the

22    question.

23    BY MR. MAUTERER:

24         Q.   Between 2007 and December of 2014, are

25    you aware of any supervisors that had been

DAVID B. HEINTZ                              April 30, 2019

41

1    disciplined for not having their officers adhere

2    to a quota?

3         A.   I'm not aware.  I'm not privy to the

4    discipline records, though.

5         Q.   Other than the two individuals that you

6    spoke to in 2007, from 2007 to December 2014,

7    did you speak with any other officers that were

8    employed during that time regarding a quota?

9         A.   I spoke to several during that time

10   period.

11        Q.   Who?

12        A.   You'd have to go through my roster to

13   look at every policeman that ever worked for me.

14        Q.   I mean, do you have any recollection as

15   you sit here today of any particular officers'

16   names?

17        A.   Brett Thomas, Ryan Mekdessie, Dustin

18   Vinet, Chris Tapie, Sidney Gonzales, Daniel

19   Swear, Paige Brouillette, Brock Frisch, Matt

20   Chaisson, Arthur Fernandez, Charlie Maynard,

21   Craig Dougherty.  I'm sure there's more.  I've

22   had -- I've gone from shift to shift.  So

23   everybody I worked with, I've always discussed

24   quotas.

25        Q.   What did you discuss generally about the

DAVID B. HEINTZ                                    April 30, 2019

42

1    quotas?

2        A.   That I don't enforce quotas.  I want you

3    to come out there and earn your paycheck.

4             MS. McDANIEL McGEHEE:

5             I've got to take this.

6             MR. MAUTERER:

7             We're going to take a recess or a

8    break, so Ms. McGehee can take her phone call.

9             MS. McDANIEL McGEHEE:

10            Thank you.

11            (Off the Record)

12            MR. MAUTERER:

13            I asked the court reporter to get the

14   last thing that Mr. Heintz said up so she can

15   read it again, so we all remember what he said

16   prior to the break.

17            Can you read that back, Ms. Court

18   Reporter?

19            (Court reporter read requested

20   material.)

21            MS. McDANIEL McGEHEE:

22            Thank you.

23   BY MR. MAUTERER:

24       Q.   The officers that you identified for us,

25   which ones, if any to your knowledge, were

DAVID B. HEINTZ                                    April 30, 2019

                                                              43
1    disciplined for not following the quota?
2              MS. McDANIEL McGEHEE:
3              I didn't write them all down.  I tried
4    to keep up.
5              THE WITNESS:
6              Paige Brouillette, Daniel Swear.
7              You asked who was written up or
8    disciplined?
9    BY MR. MAUTERER:
10        Q.   Who was disciplined.
11        A.   Because two of them were verbally
12   counseled.  There was Arthur Fernandez and
13   Charlie Maynard were verbally counseled by
14   Lieutenant Champagne.
15        Q.   Who --
16        A.   That's all I know of.
17        Q.   All right.  You made a -- it appeared as
18   if you made a distinction.  So I want to ask
19   you.
20             Is there a difference between discipline
21   and verbal counseling?
22        A.   There's no paper trail with the verbal
23   counsel.
24        Q.   Isn't it true that a verbal counseling
25   isn't considered a form of discipline at the

DAVID B. HEINTZ                                    April 30, 2019

44

1    Gretna Police Department?

2              MS. McDANIEL McGEHEE:

3              He's asking you isn't it true.

4              I'm going to object to the form of the

5    question.  It seeks policy and procedure on

6    behalf of someone not representing the Gretna

7    Police Department.

8              Go ahead and answer, if you can.

9              THE WITNESS:

10             I don't know.

11   BY MR. MAUTERER:

12        Q.  You don't know?

13        A.  No.

14        Q.  If you look at your supplemental

15   complaint, Paragraph 25, it's Paragraph 4,

16   amending Paragraph 25 of your original

17   complaint.

18        A.  Okay.

19        Q.  The Chief of Police and the Deputy Chief

20   had the sole and final authority to grant or

21   deny promotions on behalf of the Gretna Police

22   Department and the City of Gretna.  I was passed

23   up for promotion to lieutenant multiple times

24   because of my outspokenness against the Gretna

25   Police Department's unlawful quota system and

DAVID B. HEINTZ                                April 30, 2019

                                                         45

1    policy and other violations of law which were

2    occurring in the Gretna Police Department.  I

3    was further told on several occasions that I was

4    no longer a team player, and on one occasion

5    labeled as a "rat" during a division roll call

6    meeting.  The decision to pass me up for

7    promotion was made by the Chief and Deputy

8    Chief.

9              Do you see that?

10        A.  Yes.

11        Q.  How do you know that the Chief of Police

12   and Deputy Chief had the sole and final

13   authority to grant or deny promotions as you

14   state that?

15        A.  I didn't state that --

16        Q.  So this is something written by your

17   attorneys, not you?

18        A.  Correct.

19        Q.  Do you know who has the sole and final

20   authority to grant promotions at the Gretna

21   Police Department?

22        A.  Not 100 percent, but I'm sure it's the

23   Chief and the Deputy -- the Chief has final say

24   so.  It's his department.

25        Q.  It says, You were passed up for

DAVID B. HEINTZ                                    April 30, 2019

46

1    promotions to lieutenant multiple times because

2    of your outspokenness against the Gretna Police

3    Department's unlawful quota system.

4            In 2008, you were a sergeant; right?

5        A.   Right.

6        Q.   When did you start speaking out about

7    the quota system?

8        A.   I'm pretty sure I said that earlier.

9    I've always been vocal about it.

10       Q.   You said --

11       A.   When --

12       Q.   I'm sorry, go ahead.

13       A.   When I got promoted, I worked for Scott

14   Vinson as a lieutenant.  On the middle of the

15   month around the 14th-15th, Scott would go in

16   the computer, write everybody's names and their

17   stats for the month:  citations, felonies,

18   misdemeanors.  He'd present that roll call to

19   all his guys and tell them, you know what you

20   need to do.  So they would scramble to make

21   their quota for the month in order not to get --

22   I guess disciplined or harassed by Scott Vinson

23   at the time.

24       Q.   When did this occur?  I mean, what years

25   are you talking about?

DAVID B. HEINTZ                          April 30, 2019

47

1      A.   When I got promoted in 2008, I was

2    assigned to him.  When Danielle Rodriguez got

3    promoted, she worked for him.  And when me and

4    Danielle worked together, Danielle would do the

5    same thing.  Every middle of the month, she

6    would come in there and tell the guys, This is

7    what I've got, this is where you all need to be.

8           And I said -- that's when I was

9    outspoken and said, I don't care where you're

10   at.  I'm not about a quota.  I'm just, do your

11   job, protect the citizens.

12     Q.   Didn't this conversation take place in

13   2014 when you told your men that worked under

14   you, I don't care what Captain Vinson says, just

15   do your job?

16           MS. McDANIEL McGEHEE:

17           Objection.  Object to the form.  It's

18   not what his prior testimony is.

19           But answer if you can.

20           He said this conversation took place in

21   2014.

22           THE WITNESS:

23           The conversation's taken place quite a

24   few times.

25   BY MR. MAUTERER:

DAVID B. HEINTZ                                        April 30, 2019

48

1        Q.   That's what I'm trying to figure out,

2   because you've never identified at least a year

3   or time span.  You've told me when particular

4   people held different ranks.

5            Do you remember what years these

6   conversations took place?

7        A.   Throughout my career.  I can't give you

8   specific dates.  I'm just -- I've never -- like

9   I said, from the time I sat down with Lieutenant

10  Jackson that day and told him I'm not about

11  making money.  I've always said, It's not about

12  numbers, it's not about numbers.  The only

13  number I cared about was zero burglaries, zero

14  armed robberies, you know, things like that.

15           That means we're doing our job.  We're

16  protecting the citizens.  We're protecting

17  businesses.  I don't care about tickets.  So my

18  whole span, my nine years as a sergeant, I've

19  said it.

20       Q.   How do you attribute these conversations

21  or speaking out about this quota as the reasons

22  why or reason why you were not promoted to

23  lieutenant?

24       A.   I was told that I was going to get

25  promoted, and then it didn't happen.  And then I

DAVID B. HEINTZ                                    April 30, 2019

49

1    was told by Anthony Christiana, because we met

2    at his mother's house, we had a conversation,

3    because apparently I said some things and wanted

4    it cleared up.  But we had a conversation.

5            He told me wait until July and we'll

6    reevaluate it and I'll promote you in July.

7    July came.  I met with Scott Vinson, who was a

8    captain at the time.  He said that J.R. Rogers,

9    who is a lieutenant, was getting ready to retire

10   in December.  They were going to hold off on all

11   promotions until December.  He said, I'm going

12   to leave you on your shift; but you need to find

13   somebody to be your sergeant.  So he told me to

14   go start recruiting somebody to be my sergeant.

15           He recommended Kelly Landry who had

16   transferred from the road to, I think, home

17   incarceration at the time.  I approached Kelly,

18   said, Look, I'm getting promoted to lieutenant,

19   I want you to be my sergeant.  He said, I don't

20   know because I've been off the road for a little

21   bit.  I said, Well, look, I'll teach you.  We'll

22   work together.

23           So after the conversation with me and

24   Scott Vinson that night, Scott left to go home.

25   He sent me a text says, Look, this whole

DAVID B. HEINTZ                          April 30, 2019

50

1    conversation was 1089, which means off the

2    record.

3            I saw the date in (indicating) here.  I

4    had a meeting with Scott Vinson at the bus

5    terminal.  He called me over to talk to me about

6    the Daniel Swear conversation around October

7    28th.  I told him, Look, that's your case, don't

8    get me in it.  You know me and Swear are

9    friends.  He started going on there's -- we're

10   sitting side by side in the trucks.  He said,

11   There's never been a damn quota in this

12   department.  I said, Honestly?  I've been

13   written up twice for it.  You can't tell me it

14   didn't have it.  He blew a gasket.  Starting

15   screaming at me.  Why didn't you tell me about

16   this.  I said, Because you were a sergeant at

17   the time, it had nothing to do with you.  I

18   brought it straight to IAD and took care of it

19   through them.

20           He said, Well, thanks a lot for telling

21   me this.  He just kept ranting and ranting.  And

22   I said, Are we finished.  And he says, Yeah, you

23   can leave.  So I left.  Never talked to him

24   again.

25           December comes, January, whatever, J.R.

DAVID B. HEINTZ                              April 30, 2019

                                                        51

1    retires.  Boom, no promotion.

2        Q.  So based on what you just told me, am I

3    correct that you've concluded those are the

4    reasons why you are weren't promoted?

5        A.  (Witness nodded head in the

6    affirmative.)

7            MS. McDANIEL McGEHEE:

8            You have to --

9            THE WITNESS:

10           Yes.  Yes.

11   BY MR. MAUTERER:

12       Q.  Anything else?

13       A.  No.

14       Q.  Any other reasons other than what you

15   just told me?

16       A.  And then shortly after that meeting in

17   October, we did evaluations in January.  My

18   evaluation went from -- every evaluation I've

19   had prior to that meeting at the bus terminal

20   with Scott Vinson was, Should be promoted to the

21   rank of lieutenant, outstanding, you know, great

22   supervisor skills.

23           That January, Not a team player, doesn't

24   participate.  And the one after that was just,

25   same deal.  No involvement with the policemen,

DAVID B. HEINTZ                                April 30, 2019

                                                              52

1     everything like that.  It showed me looking like

2     I was a bad policeman.  Which after that many

3     years, you don't just change.

4          Q.  It sounded like, and I want to make sure

5     I understand this, you had two conversations

6     with Scott Vinson, one before the bus terminal

7     conversation and then the bus terminal

8     conversation.

9               Did I understand you correctly?

10               MS. McDANIEL McGEHEE:

11               I'm going to object to the form of the

12     question.  I think it misconstrues prior

13     statements.

14               Answer if you can.

15     BY MR. MAUTERER:

16          Q.  I'm trying to understand what you said.

17     So is that my understanding?

18          A.  You're asking if I had two meetings?

19          Q.  Yes.

20          A.  We had the roll call meeting and the

21     one-on-one meeting.

22          Q.  So the December 2014 meeting, right, the

23     roll call meeting?

24          A.  The million dollar speech?

25          Q.  Yeah.

DAVID B. HEINTZ                           April 30, 2019

53

1          A.   Okay.

2          Q.   Okay.  And then the bus terminal

3      meeting; right?

4          A.   Correct.

5          Q.   You didn't have any other meetings with

6      Scott Vinson, other than those two where the

7      discussions of a quota took place?

8          A.   He would try to engage in conversations,

9      and I would tell him I'm not talking to you

10     about it.

11         Q.   Didn't just a week before the bus

12     terminal meeting you admit and acknowledge to

13     Captain Vinson that there was no quota?

14         A.   Wait, ask me that again?

15         Q.   A week before the bus terminal meeting,

16     didn't you tell Scott Vinson you had no

17     knowledge of a quota?

18         A.   No.

19         Q.   And according to what you just testified

20     during this bus terminal meeting, Scott Vinson,

21     Captain Vinson, got upset that he was hearing

22     about a quota; right?

23         A.   Hearing about me getting written up.

24         Q.   In 2007?

25         A.   Right.

DAVID B. HEINTZ                                    April 30, 2019

54

1        Q.  So he was upset in 2015 about you

2    getting written up in 2007, is that what I'm

3    understanding your testimony to be?

4        A.  It appears that way.  Probably because

5    it just showed that it's been going on for

6    years, and he just got caught with his pants

7    down.

8        Q.  Who got caught with his pants down?

9        A.  Captain Vinson.  He's saying there's no

10   quota, and I just proved to him there was a

11   quota since 2007.

12       Q.  And you attribute him getting upset as

13   getting caught with his pants down, is that my

14   understanding of that testimony?

15            MS. McDANIEL McGEHEE:

16            No.  It misstates prior testimony.

17   It's obvious he didn't mean it literally.  But

18   answer the question if you can.

19            MR. MAUTERER:

20            I didn't mean that he literally had his

21   pants on the floor.  Come on.

22            MS. McDANIEL McGEHEE:

23            The transcript is going to read the way

24   it reads.  I'm going to object to the form of

25   the question.

DAVID B. HEINTZ                                    April 30, 2019

55

1    BY MR. MAUTERER:

2         Q.   Can you answer the question?

3         A.   Repeat the question?

4         Q.   I mean, let's face it, we understand

5    when you say "get caught with his pants down,"

6    you do not mean literally that someone had their

7    pants around their ankles.

8              It's a figure of speech; right?

9         A.   He got blind-sided.

10        Q.   So my question, though, is, are you

11   attributing Captain Vinson's reaction, him

12   getting upset, with him being caught with his

13   pants down or blind-sided regarding a quota?

14        A.   Yes.

15        Q.   Do you know when the quota law even came

16   into effect?

17        A.   Not offhand.

18        Q.   Paragraph 5 of your supplemental

19   complaint, it amends Paragraph 26.

20        A.   (Witness complying.)

21        Q.   Because of the continuous and escalating

22   conduct of the defendants, including but not

23   limited to the Chief and Deputy Chief, I felt

24   forced to resign my employment with the City of

25   Gretna, a constructive discharge.

DAVID B. HEINTZ                                    April 30, 2019

                                                              56

1           Do you see that?

2      A.   Yes.

3      Q.   What continuous and escalating conduct

4   did the Chief of Police engage in?

5      A.   They suspended me for two days, put me

6   on probation for a year, removed me from the

7   courthouse, and put me working with Lieutenant

8   Brian Rico.

9      Q.   Let's back up.  So the continuous and

10  escalating conduct are things that took place in

11  November of 2016?

12     A.   From the Chief and Deputy Chief, yes.

13     Q.   I asked just about the Chief.  I'm going

14  to ask about the Deputy Chief in a second.

15          What conduct did the Chief of Police --

16  what continuous and escalating conduct did the

17  Chief of Police engage in?

18     A.   The only thing I got is from the Chief

19  was present during the meeting and I got

20  suspended.

21     Q.   Just so I understand and the record is

22  clear, the continuous and escalating conduct of

23  the Chief was this meeting November 7 of 2016

24  and the letter that came out that's marked as

25  Heintz 3; right?

DAVID B. HEINTZ                              April 30, 2019

                                                           57

1        A.   Technically, it would have been me

2    getting reassigned from the street to the

3    courthouse after the first meeting with Deputy

4    Chief in reference to the quotas and the Rob

5    Wallow incident and everything like that.

6             Because I did nothing wrong, I did my

7    job, yet I was reassigned.  Meanwhile, the

8    people that covered it up continued staying

9    where they were at.  So that's step one.

10            Reassigned to the courthouse, read my

11   Miranda rights.  When I asked for an attorney,

12   the next day I was stripped of my police duties,

13   my police car, I had to be driven home, and I

14   had to hire an attorney.

15            So, I mean, from that meeting in August,

16   it started from there.  And then they

17   retaliated, what I feel is retaliation, by

18   digging up stuff for the past year, suspended

19   me, and put me on probation.  They put me on a

20   shift with Brian Rico, who has a reputation of

21   being the policeman that will screw another

22   policeman over in a heartbeat.  And it was time

23   to move on.

24       Q.   So let's try to breakdown some of the

25   things that you said.

DAVID B. HEINTZ                          April 30, 2019

58

1          Did the Chief of Police tell you, you

2      were being reassigned to the courthouse?

3          A.   Anthony -- Deputy Chief called me into

4      his office and said, Me and Arthur spoke.  We

5      think the best thing for you is to go to the

6      courthouse.  We have an opening over there.  So

7      I got reassigned per the Chief's decision told

8      to me by the Deputy Chief.  So yes, he did say

9      it came from the Chief.

10         Q.   All right.  So the record is clear,

11     though, the Chief did not have a personal

12     conversation with you and tell you, you were

13     being reassigned to the courthouse?

14         A.   Correct.

15         Q.   This meeting that you were just talking

16     about between yourself and Deputy Chief

17     Christiana, Captain Russell Lloyd was involved

18     in that meeting; wasn't he?

19         A.   No.  He wasn't in the room.  I don't

20     believe he was in the room.

21              But I worked all night.  Had that

22     meeting that morning, and then maybe four hours

23     later I was called back into the Deputy Chief's

24     office.  If Captain Lloyd was there, I don't

25     remember him being in the room.

DAVID B. HEINTZ                              April 30, 2019

                                                          59

1        Q.  You say you were read your Miranda

2   rights.

3            Did the Chief of Police read you your

4   Miranda rights?

5        A.  No, sir.

6        Q.  Was the Chief of Police in the room when

7   you had conversations with Internal Affairs?

8        A.  No.

9        Q.  Did the Chief of Police tell you, you

10  were put on administrative leave at any time?

11       A.  No.

12       Q.  Did the Chief of Police assign you to

13  Lieutenant Brian Rico's shift?

14       A.  You'd have to look at the memo to see

15  who signed off on it.  I don't know.

16       Q.  The Chief of Police didn't have a

17  conversation with you and tell you, you know,

18  Sergeant Heintz, you're going --

19       A.  Actually, he did.

20       Q.  He did?

21       A.  When I got (indicating) this --

22           MS. McDANIEL McGEHEE:

23           Let the record reflect that the

24  Deponent is touching Heintz --

25           THE WITNESS:

KAY E. DONNELLY & ASSOCIATES
504.299.8220

DAVID B. HEINTZ                          April 30, 2019

60

1           Exhibit 3.

2           MS. McDANIEL McGEHEE:

3           Exhibit 3.

4           THE WITNESS:

5           When I got (indicating) this --

6    BY MR. MAUTERER:

7       Q.   Heintz 3?

8       A.   -- Heintz 3, and the Deputy Chief walked

9    out, the Chief was still there; and he explained

10   to me that I was going back to patrol to work

11   for Brian Rico.

12           I actually asked to stay at the

13   courthouse, because I felt protected there.

14      Q.   You were making more money there too;

15   weren't you?

16      A.   No.

17      Q.   Really?

18      A.   No.

19           MS. McDANIEL McGEHEE:

20           I'm going to ask -- I'm going to object

21   to the form of the question as asked and

22   answered and harassing.

23   BY MR. MAUTERER:

24      Q.   You were not making more overtime while

25   at the courthouse working Courthouse Security?

DAVID B. HEINTZ                          April 30, 2019

61

1      A.   No.   Shannon Johnson was still assigned

2   to the courthouse.   Shannon Dugas.   Shannon

3   Dugas was making all the overtime, not Dave

4   Heintz.

5      Q.   Didn't you tell Captain Lloyd that you

6   wanted to stay at the courthouse, because you

7   were making more overtime?

8      A.   No.   I told the Chief I wanted to say

9   there, because I was afraid of coming back to

10  the street and working for Captain Vinson,

11  because Captain Vinson was not disciplined at

12  that time.   So I had no desire to come back and

13  work for a man that I just accused of covering

14  up a felony.

15     Q.   What made you believe a felony was

16  covered up?

17     A.   Rob Wallow was never charged.   He's on

18  video kicking a man in handcuffs.   He violated

19  his rights.   Rob Wallow should have been

20  arrested.

21     Q.   To your knowledge, Rob Wallow was not

22  arrested?

23     A.   He was after I spoke out about it.

24     Q.   So as we sit here today, you know Rob

25  Wallow was arrested; correct?

DAVID B. HEINTZ                                    April 30, 2019

                                                              62

1         A.   Yes.

2         Q.   So sitting here today, you know Rob

3    Wallow was charged; right?

4         A.   Yes.

5         Q.   As we sit here today, you know Rob

6    Wallow is not with the Gretna Police Department;

7    right?

8         A.   I don't know that.

9         Q.   So what I'm understanding you to say,

10   and correct me if I'm wrong, is that you're

11   attributing those actions to occur because you

12   spoke out?

13        A.   Correct.

14        Q.   So I'm trying to understand, regardless

15   if the reason Officer Wallow was arrested and

16   charged was because you spoke out or for any

17   other reason, the end result is there was no

18   coverup; was there?

19        A.   There was.

20        Q.   Let me -- Rob Wallow didn't get away

21   Scot-free.  He was charged; right?

22        A.   He was eventually charged, yes.

23        Q.   And he was -- he's not with the

24   department anymore; right?

25        A.   I don't know.

DAVID B. HEINTZ                          April 30, 2019

                                                              63

1        Q.  How would you define coverup,

2   Mr. Heintz?

3        A.  You have a policeman on video kicking a

4   guy in handcuffs.  I provide my captain with a

5   copy of the videotape, who was on scene and

6   witnessed it himself, and never disciplined him.

7            How is that not a coverup?

8        Q.  Okay.  But I guess I'm confused, because

9   you know the man was disciplined.  You know

10  Officer Wallow was disciplined.

11           He was arrested and charged; right?  You

12  do know that?

13       A.  Some months later, correct.

14       Q.  So I understand it, you consider that to

15  be a cover-up, because it didn't happen

16  immediately?

17       A.  And it wasn't going to happen unless I

18  spoke up.

19       Q.  Okay.  What made --

20           MS. McDANIEL McGEHEE:

21           Wait, wait, wait.  I'm going to ask

22  that the Deponent allow the question to be asked

23  fully and that the answer be fully given before

24  you start the next question, because it seems

25  like you're getting more into a conversation

DAVID B. HEINTZ                           April 30, 2019

                                                           64

 1    than question and answer.

 2              Subject to that, you can answer

 3    whatever question is posed.

 4    BY MR. MAUTERER:

 5        Q.   What makes you believe that nothing was

 6    ever going to happen, as you just stated?

 7        A.   He was -- because he continued working,

 8    nobody knew anything about it.  It would have

 9    been covered up had I not said it in that

10    meeting with Lenny Levenson, who has to report

11    it, because he's an officer of the court, right.

12              So had -- and I've seen other things

13    that leaded from videos, which is in all the

14    write-ups that Tris Lear did.  So you can look

15    through that and figure it out.

16              I can't tell you what I believe.  I'm

17    telling you, I believe it was a cover-up.  Okay?

18        Q.   Okay.  While you were employed with the

19    Gretna Police Department as a sergeant, did

20    Internal Affairs answer to you?

21        A.   You've got to explain that.

22        Q.   Did Internal Affairs report to you what

23    it was doing in the investigations it was

24    conducting and the results thereof?

25              MS. McDANIEL McGEHEE:

DAVID B. HEINTZ                          April 30, 2019

65

1            It's a multiple question.  I'm going to

2    object to the compound nature of the question.

3    BY MR. MAUTERER:

4        Q.  I can break it down, if you need me to.

5    But did Internal Affairs report to you the

6    investigations they were conducting?

7        A.  If it was forwarded by me, usually they

8    told me what was going on with it.

9        Q.  Did Internal Affairs report the results

10   of their investigations to you?

11       A.  Just in general?

12       Q.  Yeah.  Did Internal Affairs report their

13   results of their investigations to Sergeant

14   Heintz?

15       A.  No.

16       Q.  Did the Deputy Chief report to Sergeant

17   Heintz the actions he decided to take?

18       A.  If it was an officer on my shift, I

19   would get forwarded a letter saying -- like I

20   would get cc'd a copy saying, This is the

21   disciplinary action taken against so-and-so.

22       Q.  Did the Chief of Police ever report to

23   Sergeant Heintz and tell him what actions the

24   Chief of Police had decided to take?

25       A.  No.  It would fall under the same thing

DAVID B. HEINTZ                              April 30, 2019

66

1    where I would get cc'd a copy of the

2    disciplinary action taken.

3         Q.  So it appears to me, I'm trying to

4    understand, that based upon what you experienced

5    in your career that some times you were kept in

6    the loop.  You expected to be kept in the loop

7    as to what was happening to Officer Wallow.

8              Is that a fair statement?

9         A.  Yes.

10        Q.  And because you weren't kept in the loop

11   on this particular incident, you believe that

12   the matter was going to be covered up; right?

13        A.  Correct.

14        Q.  Paragraph 30 of your original complaint,

15   Mr. Heintz, it says -- let me know when you get

16   there?

17        A.  Uh-huh.  (Affirmative response.)

18        Q.  In August 2016, I spoke out to Deputy

19   Chief Anthony Christiana of internal impropriety

20   within the Gretna Police Department, the

21   existing unlawful quota system and policy and an

22   incident of police brutality.

23              Do you see that?

24        A.  Yes.

25        Q.  Is that this statement that you were

DAVID B. HEINTZ                              April 30, 2019

67

 1    talking about with Lenny Levenson?

 2        A.   Yes.

 3        Q.   And I think you recall saying, so

 4    correct me if I'm wrong, this was taken in

 5    connection with the Daniel Swear matter; right?

 6        A.   Correct.

 7        Q.   Look at your supplemental complaint,

 8    Paragraph 6, it amends Paragraph 32?

 9        A.   (Witness complying.)

10        Q.   Officials of the Gretna Police

11    Department, including but not limited to the

12    Chief and Deputy Chief, knew of my speech to

13    persons outside of the Gretna Police Department

14    regarding the department's unlawful quota system

15    and policy, police brutality, and internal

16    impropriety.  In fact, I specifically told my

17    supervisors in an October 2015 meeting that I

18    had been speaking out against the unlawful quota

19    and other departmental impropriety to people

20    outside the police department.

21             Do you see that?

22         MS. McDANIEL McGEHEE:

23             I'm going to object to the form of the

24    question.  You misread it.

25             MR. MAUTERER:

DAVID B. HEINTZ                          April 30, 2019

                                                              68

1              What did I misread?

2              MS. McDANIEL McGEHEE:

3              You misread your paragraph.

4              MR. MAUTERER:

5              What did I misread?  Let's correct it.

6     What sentence did I misread?

7              MS. McDANIEL McGEHEE:

8              You said, In fact, I specifically told

9     my supervisors in October of 2015 --

10             MR. MAUTERER:

11             Supervisor, singular.  I'm sorry.

12             MS. McDANIEL McGEHEE:

13             There you go.

14    BY MR. MAUTERER:

15       Q.  How did the Chief and Deputy Chief know

16    of your speech to persons outside of the Gretna

17    Police Department?

18             It's the first sentence.

19       A.  I don't know.  I mean, I didn't write

20    this.  I'm trying to figure out how they -- what

21    that was from.

22       Q.  Well, as you sit here today, are you

23    aware or do you know if the Chief and Deputy

24    Chief knew that you were talking to people

25    outside of the Gretna Police Department

DAVID B. HEINTZ                                April 30, 2019

69

1    regarding an unlawful quota system, police

2    brutality, and internal impropriety?

3        A.   I can't recall what this was about.  I'm

4    sorry.

5        Q.   The second sentence says, In fact, I

6    specifically told my supervisor in an October

7    2015 meeting.

8             That was Scott Vinson?

9        A.   Once again --

10            MS. McDANIEL McGEHEE:

11            Let me object to the form of the

12   question.

13   BY MR. MAUTERER:

14       Q.   Do you know who the supervisor was in

15   the October 2015 meeting that your Paragraph 32

16   is talking about?

17       A.   Honestly, no.  I kept notes.  And when

18   me and, I guess, Corey did this, we went off my

19   notes; but I don't have my notes.

20       Q.   You had submitted in discovery,

21   Mr. Heintz, in this case, a Declaration you had

22   signed in the Daniel Swear case.  I'll mark that

23   as Heintz 4.

24            My first question to you is, flip

25   through it, do you recognize that to be the

DAVID B. HEINTZ                              April 30, 2019

                                                                70

 1    Declaration that you've signed?

 2         A.   Yes.

 3         Q.   In Paragraph 17, it's on Page 3 of your

 4    Declaration, it says, We were required to meet a

 5    standard quota of 10, 2, and 2.  It was my

 6    understanding that the 10, 2, and 2 quota had

 7    been with the Gretna Police Department since

 8    before I began to work at the department.  The

 9    10, 2, and 2 quota meant that patrol officers

10    were required to have 10 items, 2 citations, and

11    2 arrests per shift, which had to equal to the

12    required total by the end of the month.

13         Do you see that?

14         A.   Yes.

15         Q.   Is that a correct statement of your

16    understanding of what the 10, 2, and 2 quota

17    was?

18         A.   Yeah.  10 items, 2 citations, and 2

19    arrests per shift.  Right.

20         Q.   And that it had to equal to the required

21    total by the end of the month; right?

22         A.   Correct.

23         Q.   Paragraph 21 says, In approximately

24    November or early December, we had a supervisor

25    meeting with Scott Vinson in which we were

DAVID B. HEINTZ                                    April 30, 2019

71

 1    advised that we needed to come up with a game

 2    plan on how to run our shifts more productively.

 3    It was clear that since officers were rated by

 4    arrest and tickets that we were expected to push

 5    our teams to achieve a greater number of tickets

 6    and arrests.

 7         Do you see that?

 8    A.   Yes.

 9    Q.   Paragraph 22 says, In response to this

10    request, I sought advice because I did not want

11    to push a quota system because I did not agree

12    with it.

13         Who did you seek advice from?

14    A.   My friend Mike Kinler.  He's a captain

15    with Jefferson Parish Sheriff's Office.

16    Q.   Paragraph 25 says, As a supervisor who

17    is responsible for C-team, I was unaware of any

18    allegation that the officers were working only

19    one-and-a-half hours per shift as being the

20    basis for this December meeting with Scott

21    Vinson.  As a sergeant over the C-team, I would

22    have expected that if there were the belief that

23    my team was only working this amount of time

24    that this would have brought to my attention,

25    because I was responsible for overseeing the

DAVID B. HEINTZ                                    April 30, 2019

72

1    team.

2            Do you see that?

3        A.   Yes.

4        Q.   As a sergeant over the C-team, didn't

5    you have to -- as one of your duties, didn't you

6    have to review the time sheets of the officers?

7        A.   The trip sheets, yes.

8        Q.   Did you do that?

9        A.   Yes.

10       Q.   After reviewing the time sheets of your

11   officers, how did you not know that they were

12   only working an average of one-and-a-half hours

13   per shift?

14       A.   Working night shift I told my guys, and

15   it was taught to me when I first came to JPSO,

16   give me something on your trip sheet every hour.

17   I don't care, stop, do a business check every

18   hour.  So I asked my guys, every hour give me

19   something.  Go to Race Trac, go to Circle K,

20   whatever.  You prevent armed robberies by

21   checking on businesses.

22           So my guys would put business checks or

23   whatever on their trip sheets.  But that didn't

24   account for items.  So when Captain Vinson or

25   Lieutenant Champagne would check them later,

DAVID B. HEINTZ                          April 30, 2019

73

1   they were just going from time from last call to

2   next call and not counting business checks.

3            And I expressed my philosophy that you

4   need to do business checks; and I was told by

5   Lieutenant Champagne, Business checks don't

6   bring money into the city.  So once again, it

7   was about the money.

8            We're there to prevent crimes.  That's

9   why we're there.  So if you give me six business

10   checks in a 12-hour shift and you handle a few

11   calls, I was good with it.

12       Q.  When did Lieutenant Champagne have this

13   conversation with you about business checks

14   don't bring in money?

15       A.  Probably in 2016 after one of my

16   evaluations, my poor evaluations.

17       Q.  Do you remember where you were when he

18   said it?

19       A.  In his office or the night watch office.

20   We shared an office.

21       Q.  Arresting drug dealers is preventing

22   crime; isn't it?

23            MS. McDANIEL McGEHEE:

24            That's what the question is?

25            MR. MAUTERER:

DAVID B. HEINTZ                           April 30, 2019

74

1          Yes.

2               MS. McDANIEL McGEHEE:

3               Object to the form.

4     BY MR. MAUTERER:

5          Q.   If you arrest a drug dealer, that would

6     be stopping crime; right?

7          A.   You arrested somebody, right.  Okay.

8          Q.   There's drug activity in the City of

9     Gretna; isn't there?

10         A.   Yes.

11         Q.   Do business checks correlate to drug

12    activity arrests?

13         A.   It could.

14         Q.   So could driving around the city looking

15    for people selling drugs; couldn't it?

16         A.   Sure.

17         Q.   Paragraph 26 of your Declaration says,

18    Scott Vinson told me that we as supervisors

19    would be held accountable if the numbers

20    slipped.  To my knowledge, after that meeting,

21    more officers began to get written up for

22    failing to meet the 10, 2, and 2 quotas.

23              Do you see that?

24         A.   Yes.

25         Q.   Which officers were getting written up

DAVID B. HEINTZ                              April 30, 2019

75

1   for not following this 10, 2, and 2 quota?

2        A.   Daniel Swear, Paige Brouillette.

3        Q.   Any others?

4        A.   Not that I'm aware of.  They worked for

5   me, so that's how I know.

6             Actually, Paul Pichoff too.

7        Q.   Anybody else?

8        A.   I think that's it.

9        Q.   Paragraph 32, Scott Vinson sent all

10  patrol supervisors the photographs of the dry

11  erase board that were in his office.  Some of

12  these pictures are attached as Exhibits 1 and 2.

13  The dry board was plain view of all people

14  walking by Scott Vinson's office; right?

15            That's what it says; correct?

16       A.   Correct.

17       Q.   Let's look at Exhibits 1 and 2 that are

18  attached to your Declaration?

19       A.   (Witness complying.)

20       Q.   Looking at Exhibit 1, there's some green

21  numbers at the top of the page.

22            You can see the months, January,

23  February, March?

24       A.   Right.

25       Q.   And there is some green numbers above

DAVID B. HEINTZ                                    April 30, 2019

76

1    that; correct?

2         A.   Okay.

3         Q.   You see them; don't you?

4         A.   Yeah, 8, 5, whatever, 8, 6 whatever.

5         Q.   What do those mean?

6         A.   Not a clue.

7         Q.   Now, right underneath the months, there

8    is symbols for each officer that's listed down

9    the left side of the column; right?

10        A.   Right.

11        Q.   What does a green star mean?

12        A.   Don't know.

13        Q.   What does a green check mean?

14        A.   Don't know.

15        Q.   What does a green dot next to an

16   officer's name mean?

17        A.   Don't know.

18        Q.   What does a red dot next to an officer's

19   name mean?

20        A.   Don't know.

21        Q.   What does a red check mean?

22        A.   From my interpretation, looking at the

23   stats for that month, a red check meant they

24   were low on citations.

25        Q.   Did anyone ever tell you what a red

DAVID B. HEINTZ                                    April 30, 2019

                                                                77

1    check meant?

2         A.   No.  I asked Captain Vinson.  He told me

3    it was none of my damn business.

4         Q.   So your understanding of what a red

5    check meant is that, it's your understanding;

6    correct?

7         A.   It went along with monthly statistics of

8    the officers that we kept.  If you compared

9    tickets with red checks, you'll see they all go

10   along.

11        Q.   We'll get to that in a minute.

12             What does a red "X" mean?

13        A.   I don't know.

14        Q.   What does a green N/A mean?

15        A.   Not Applicable.  If you look at Neveaux,

16   he's got N/As all the way across.  He didn't

17   start until -- or he didn't go solo until June

18   of that year.  So N/ A means he was still in

19   training, wasn't employed full time yet.

20        Q.   In Paragraph 33 of your Declaration it

21   says, The dry erase board was used by Scott

22   Vinson to keep track of the officer stats.  It

23   was apparent that the red checks on the dry

24   erase board meant that the officer failed to

25   meet the quota requirement.  If the officer did

DAVID B. HEINTZ                              April 30, 2019

                                                              78

1    meet the quota requirement, there would be a

2    green star or check next to the officer's

3    name.

4             Do you see that?

5         A.   Right.

6         Q.   When I just asked you what a green check

7    or green star meant, you didn't tell me that it

8    was that the officers met the quota; did you?

9         A.   No.  Well, the -- the green mark meant

10   good.  The red meant bad.  But as far as the

11   stars and the checks, I can't tell you what each

12   one -- why he had a star, why he had a check.

13            Like I said, Scott told me it was none

14   of my business.

15        Q.   And again, you're concluding that no one

16   ever told you green was good and red was bad;

17   right?

18        A.   Nobody told me.

19        Q.   Now, Paragraph 35 says, In these stat

20   sheets, Scott Vinson would identify any

21   deficiency in red.  When I check, these stars

22   and checks correlated with the officers' stat

23   sheets.  I attached as Exhibit 3 a copy of Lloyd

24   II, April 2015 stat sheet showing the red line

25   deficiency in red that corresponds to Exhibit 1.

DAVID B. HEINTZ                              April 30, 2019

                                                      79

1            Do you see that?

2            Let's look at Exhibit 3?

3       A.   (Witness complying.)

4       Q.   When you're talking about the red line

5  deficiency, is that the Citations block that's

6  in red on Exhibit 3?

7       A.   What was the question?

8       Q.   In your Declaration you say that the

9  April 2015 stat sheet showing the red line

10 deficiency in red, that corresponds to

11 Exhibit 1.

12           I'm trying to find out what do you mean

13 by the red line deficiency.  The only thing I

14 see red on that page is a block that says

15 Citations.

16      A.   Right.

17      Q.   So is that the red line deficiency in

18 which you're referring?

19      A.   Yeah.  I think the -- that's what it's

20 for.  But -- yeah, he's got the red line for the

21 citations; and then he's got a red check on

22 Exhibit 1.

23      Q.   For April?

24      A.   Right.

25      Q.   Assuming that you're correct, that

DAVID B. HEINTZ                                April 30, 2019

80

1      there's a quota and it's 10, 2, and 2, that

2      would have meant that Officer Lloyd II working

3      11 days would have needed 22 citations; right?

4          A.   Right.

5          Q.   He wrote 24 citations in April; right?

6          A.   Right.

7          Q.   So how does -- assuming that there's a

8      quota, how does writing two more tickets than

9      required by the quota correlate to a red check?

10         A.   Okay.  Like I said, Scott Vinson's

11     middle of the month spiel would come out.  He

12     would check stats.  Around the middle of the

13     month, he would put a red line across.

14     Apparently whoever his supervisor was at the

15     time didn't delete the red line.

16              I would get a red line, like for Charlie

17     Maynard or one of them; and I would show them,

18     Look, you've got a red line across here with a

19     WTH or WTF next to it.

20              So mid-month you'd get the red line,

21     WTF.  And then they would know they needed to

22     pick up to get to that number at the end of the

23     month.  So I can't tell you when the red line

24     was added to it.  But apparently he got the red

25     line; and then, I guess, picked up his stats.

DAVID B. HEINTZ                              April 30, 2019

                                                            81

1           And whoever -- they should have never

2    turned that in with the red line.  I mean,

3    everybody deletes the red line to get rid of --

4    to show it's -- because the red line stands out,

5    so they get rid of it.  But apparently somebody

6    forgot to remove that one.

7           Q.  You said a lot there.  Let's break some

8    of this down.

9           First of all, are you saying that Scott

10   Vinson puts red lines on stat sheets?

11          A.  Yes.

12          Q.  Then you're saying someone would remove

13   the red lines from the stat sheets; right?

14          A.  I did.

15          Q.  You removed red lines from stat sheets?

16          A.  Yes.

17          Q.  Other than the one that we're talking

18   about, Exhibit 3, do you have any copies of time

19   sheets that have red lines across them?

20          A.  No.

21          Q.  Do you recall how you came into

22   possession of this one that's Exhibit 3?

23          A.  I searched through the computer.

24          Q.  The computer where?

25          A.  In my office.

DAVID B. HEINTZ                              April 30, 2019

                                                        82

1        Q.   And you printed this out?

2        A.   Yes.

3        Q.   When you printed it out, it had a red

4    line on it?

5        A.   Yes.

6        Q.   I'm looking at Exhibit 1.  Do you have a

7    stat sheet for Officer Alfaro for June showing

8    that he didn't meet the quota?

9        A.   She.  No.

10       Q.   What about Officer Faison?

11       A.   No.

12       Q.   You don't have stat sheets for Officer

13   Faison showing that that officer didn't meet the

14   quota?

15       A.   No.

16       Q.   What about Officer Freeney, he got a

17   check and an "X."  Do you have any stat sheets

18   for him showing he did or did not meet the

19   quota?

20       A.   No.

21       Q.   What about Officer Louis, he got a red

22   check in May.  Do you have a stat sheet for

23   Officer Louis stating that he didn't meet the

24   quota?

25       A.   No.

DAVID B. HEINTZ                                    April 30, 2019

83

1          Q.   What about Officer Verrett, do you have

2     any stat sheets from January or April showing

3     that he did not meet a quota?

4          A.   No.

5          Q.   What about Officer Neveaux, do you have

6     a stat sheet for June showing that he didn't

7     meet a quota?

8          A.   No.

9          Q.   What about Officer Maynard, do you have

10    a stat sheet for him showing that he didn't meet

11    a quota in January?

12         A.   No.

13         Q.   Look at Exhibit 2, applying your same

14    testimony, a red check would mean that you

15    didn't meet the quota; right?

16         A.   Right.

17         Q.   That's your understanding.

18              Do you have anything that says Officer

19    Freeney didn't meet the quota in July?

20         A.   No.

21         Q.   Now, you testified earlier that you are

22    aware that Officers Brouillette, Swear, and

23    Pichoff had been disciplined for not following a

24    quota; right?

25         A.   Right.

DAVID B. HEINTZ                                    April 30, 2019

                                                              84

1        Q.   Officer Pichoff has testified in this

2   case that the quota was 3 to 4 citations and 1

3   arrest per shift.

4            Do you know why he would believe the

5   quota is different than the one you're saying

6   the quota is 10, 2, and 2?

7        A.   I can't answer that.

8        Q.   Have you ever heard of a 3 to 4 citation

9   and 1 arrest per shift quota?

10       A.   Have I heard of it?

11       Q.   Yeah.  At the Gretna Police Department,

12   have you ever heard that the quota was 3 to 4

13   citations and 1 arrest per shift?

14       A.   I heard one mandatory arrest every day

15   for Pichoff, if that's what you're asking.  I

16   heard the tape.

17       Q.   So Pichoff you heard this from; correct?

18       A.   No.  I heard it from J.R. Rogers on a

19   recording.

20       Q.   Did you ever hear from Scott Vinson that

21   there was a quota of 3 to 4 citations and 1

22   arrest per shift?

23       A.   No.  It was 10, 2, and 2.

24       Q.   Did you hear from Deputy Chief Anthony

25   Christiana that there was a quota of 3 to 4

DAVID B. HEINTZ                                April 30, 2019

                                                        85

1     citations and 1 arrest per shift?

2          A.   No.

3          Q.   Did you ever hear from Chief Arthur

4     Lawson that there was a quota of 3 to 4

5     citations and 1 arrest per shift?

6          A.   No.

7          Q.   Now, Daniel Swear says that the quota is

8     3 traffic citations or summons per day and an

9     average of 1 arrest every two days.

10          Have you ever heard that from anyone

11     other than Daniel Swear?

12          A.   No.  Well, I heard the recording of

13     Danielle.  So yeah, I did hear it.

14          Q.   Anyone else?

15          A.   No.

16          Q.   Now, Heintz 3 is a letter on the Gretna

17     Police Department letterhead; right?

18          A.   Right.

19          Q.   And it's signed by the Deputy Chief,

20     Anthony Christiana; right?  At the top, you see

21     his initials?

22          A.   That (indicating)?

23          Q.   Let's back it up.  Do you know if that

24     is signed by the Deputy Chief or not?

25          A.   I don't know.

DAVID B. HEINTZ                              April 30, 2019

                                                              86

1        Q.  You agree with me, though, that is a
2   document that bears the letterhead of the Gretna
3   Police Department; right?
4        A.  Correct.
5        Q.  Have you ever seen anything in writing
6   on the Gretna Police Department letterhead that
7   says the quota is 10, 2, and 2?
8        A.  Not specifically 10, 2, and 2; but I did
9   see on this letterhead that I failed to meet my
10  quota for the month, which was 2 citations for
11  every day I worked.
12       Q.  So there is a document on that
13  letterhead that has the word quota on it?
14       A.  No.  Goal.
15       Q.  There's a document that says 10, 2, and
16  2 for a month?
17       A.  No, 2 citations.  Mine only had 2
18  citations.  I didn't fail to follow the stats.
19  So I don't know.  But all I got was the ding for
20  the citations.
21       Q.  Is this the one that you were talking
22  about with Captain Jarvis?
23       A.  Yes.
24       Q.  So you're talking about the write-up in
25  2007 that you told us about earlier; right?

DAVID B. HEINTZ                          April 30, 2019

87

1        A.   Yes.

2        Q.   The one that you don't have a copy of;

3    right?

4        A.   Right.  Or I can't find.  I'm not going

5    to say I don't have it.  I just can't find it.

6        Q.   We've talked a little bit about quota.

7    Throughout your complaints there is this

8    three-part thing that you were talking about.

9    You're talking about the unlawful quota system,

10   you're talking about police brutality, and

11   you're talking about internal impropriety.

12   Okay?

13       A.   Okay.

14       Q.   Do you remember that from your

15   complaints?

16       A.   Yes.

17       Q.   All right.  The police brutality that

18   you're talking about in your complaint, is that

19   the Rob Wallow incident?

20       A.   Yes.

21       Q.   Is there any other incident of police

22   brutality that you are intending that to mean,

23   other than the Rob Wallow incident?

24       A.   No.

25       Q.   The statement concludes, And internal

DAVID B. HEINTZ                              April 30, 2019

88

1      impropriety.  What internal improprieties are

2      you talking about in your complaints?

3           A.   That would be something that the

4      attorney wrote up.  I hate to say it, dumb it

5      down for me.  I don't know.  It's legal stuff.

6      I don't --

7           Q.   And it may be something the lawyer

8      wrote.  I'm just trying to understand what you

9      believe these statements mean in your complaint.

10               Are you aware of any internal

11     wrongdoings?

12          A.   Okay, I got you.

13          Q.   Use a different word.

14          A.   The violation of my rights, the

15     violation of the Policeman Bill of Rights, and

16     what I felt was retaliation for speaking out

17     against the Rob Wallow incident, and against the

18     quotas.

19          Q.   Anything else?

20          A.   I don't know.

21          Q.   How were the Policeman's Bill of Rights

22     violated?

23          A.   My police powers were stripped within --

24     well, actually, from the point with the Rob

25     Wallow incident, when the criminal investigation

DAVID B. HEINTZ                                    April 30, 2019

89

1    was being launched, within six hours I was

2    reassigned.  I wasn't given a chance to say

3    anything.  I was just told that I was being

4    reassigned to the courthouse.

5           Within a week I was brought in, read my

6    Miranda rights by Lieutenant Gray Thurman -- I'm

7    sorry, Sergeant Gray Thurman and Lieutenant

8    Covell.  They gave me my Miranda rights, not a

9    Garrity Rights form, and said you're being

10   investigated for malfeasance.

11          At which time I asked, Who, against me;

12   and he said, I can't tell you.  I said, Well,

13   I'd like to speak to an attorney.  It was

14   concluded from then.  The next day I got to

15   work, Captain Jerry Lacour said, We need to go

16   to the office.  Apparently Anthony had some

17   questions in reference to or to clarify some

18   things, because you asked for an attorney.  I

19   said, Okay.

20          So I get over there; and he said, I

21   heard you asked for an attorney.  I said, Yes,

22   sir.  I think that's my right as a U.S. citizen.

23   And he said, Okay, I need your badge, your gun,

24   keys to your unit.  You're no longer allowed to

25   do police work, and you need to hire an attorney

DAVID B. HEINTZ                                April 30, 2019

90

1    before you come back to work.  And I was

2    transported home with no gun, no badge, no

3    nothing.

4        Q.  You were put on administrative leave

5    that day?

6        A.  That's what they called it.  I had no

7    police powers.  Couldn't work any details.  So

8    I'd call it a suspension.  You can call it what

9    you want.  You took everything away from me.

10       Q.  You were continued to be paid while you

11   were on administrative leave; weren't you?

12       A.  Yes.  Minus my details.

13       Q.  Now, you said you were told at some

14   point in time you were transferred to the

15   courthouse; right?

16       A.  Correct.

17       Q.  I'm going to show you what I'm marking

18   as Heintz 5.  This is a document dated August

19   26, 2016 to All Personnel regarding your

20   transfer to the courthouse effective August

21   29th, 2016; correct?

22       A.  Correct.

23           MS. McDANIEL McGEHEE:

24           I'm going to object to the form of the

25   question.  You said August 29th.  It's August

DAVID B. HEINTZ                              April 30, 2019

                                                                91

1    26th.

2    BY MR. MAUTERER:

3        Q.   Your first day of work at the courthouse

4    was going to be August 29th; right?

5        A.   Correct.

6        Q.   That's what it says in the second

7    sentence of this second paragraph of this

8    document; right?

9        A.   Yes.

10            MS. McDANIEL McGEHEE:

11            I object to the form of the question.

12   It actually doesn't.  It says --

13            THE WITNESS:

14            Davis Heintz.

15            MS. McDANIEL McGEHEE:

16            -- Davis Heintz.

17   BY MR. MAUTERER:

18       Q.   And then you said you were -- at some

19   point in time, you were called in to the Deputy

20   Chief's office; and you were informed of an

21   investigation; isn't that true?

22       A.   I was called into the conference room

23   first, I believe.

24       Q.   You were put on administrative leave as

25   a result of the criminal investigation?

DAVID B. HEINTZ                              April 30, 2019

92

1      A.   Revoking my rights, yes.

2      Q.   Let me show you what I'm marking as

3   Heintz 6.  This is a memo dated September 1st,

4   2016.  It says, As you are aware the Gretna

5   Police Department is conducting a criminal

6   investigation into a matter concerning an

7   incident which occurred April 22nd, 2016.

8           That's the Rob Wallow incident; right?

9      A.   Correct.

10     Q.   At this time you're being placed on

11  administrative leave with pay, because of the

12  criminal investigation; right?

13     A.   Yes.

14     Q.   And you're required to surrender your

15  Gretna Police Department identification, weapon,

16  and other items as directed by the Internal

17  Affairs Division.  You will no longer have

18  enforcement authority and you will not be able

19  to work any off-duty assignments until further

20  notice; right?

21     A.   Correct.

22     Q.   Detail assignments are a benefit that

23  the Chief of Police provides for the officers;

24  right?

25     A.   Sure.  The department allows you to work

DAVID B. HEINTZ                          April 30, 2019

                                                            93

1    them.

2          Q.   They're not mandatory to allow officers

3    to work, work details; right?

4          A.   Not mandatory.

5          Q.   It's kind of a privilege to work a

6    detail or to be allowed to work a detail; right?

7          A.   Privilege?  Okay.  I don't know too many

8    policemen that can survive on a policeman's

9    salary without working them, though.  So, I

10   mean, it's a -- to all of us, it's considered

11   your job.

12         Q.   In working a detail, you're acting --

13   you're serving as a Gretna Police Officer for

14   the benefit of a private company; right?

15         A.   Right.

16         Q.   You worked at Entergy and provided

17   security for Entergy; right?

18         A.   Right.

19         Q.   You're not patrolling the streets of

20   Gretna while you're working a detail; right?

21         A.   Right.

22         Q.   Now, you told us earlier that -- I was

23   asking you questions about approving tickets.

24   Do you remember that?  And you said that you

25   refused to sign a form for Lieutenant Champagne.

DAVID B. HEINTZ                          April 30, 2019

                                                                94

1              MS. McDANIEL McGEHEE:

2              I'm going to object to the form of the

3      question.

4      BY MR. MAUTERER:

5         Q.  Do you remember that?

6         A.  Yes.

7         Q.  Let me show you what I'm marking as

8      Exhibit 7.  This is Administrative & Personnel

9      Management Report, Gretna Police Department.

10     It's dated at the bottom August 2nd, 2016 by

11     Lieutenant Dean Champagne.

12             Do you recognize this document?

13        A.  No.

14        Q.  If you look at the second page, just the

15     checkmark says, Refused to sign.

16             Is this the form that you refused to

17     sign for Lieutenant Champagne?

18        A.  I don't know if this is it or not.  I

19     didn't sign it.  I didn't read it.

20        Q.  You didn't want to read it; did you?

21             MS. McDANIEL McGEHEE:

22             Object to the form of the question.

23     You can answer, if you can.

24             THE WITNESS:

25             When he approached me and said -- I was

DAVID B. HEINTZ                                    April 30, 2019

                                                              95

1     under the impression, I believe that I did check

2     it.  I asked him to verify it before he came at

3     me with a false allegation.  And I told him, I

4     said, If you are able to show me on the computer

5     that I didn't do it, then I'll sign off on it or

6     whatever.

7              But I never heard from him again.  So

8     as far as I knew, I guess he went and verified

9     it; and I was cleared.  So he never brought it

10    back to me.

11    BY MR. MAUTERER:

12         Q.  You were presented this document;

13    weren't you?

14         A.  I wasn't given it to -- he had it and he

15    said, The Deputy Chief called, said that you

16    didn't check some citations in the DigiTicket,

17    and I need to write you up.  And I said, Well,

18    no, let's go check, look at the thing.

19              And we walked into the roll call room,

20    tried to pull it up; and he said, I don't have

21    access to it.  He said, I'm going to have to get

22    with Terry to find it.  I said, Okay, we'll get

23    with Terry and find out when the last tickets

24    were that I approved.  And I said, We'll go from

25    there.  I never heard anything else again.

DAVID B. HEINTZ                              April 30, 2019

96

1        Q.  Now, at some point in time you were
2   advised, weren't you, Mr. Heintz, that you were
3   going to be under an internal investigation
4   regarding some inaccuracies that were found in
5   your trip sheets; isn't that correct?
6        A.  Is that when he rewrote this
7   (indicating) letter?
8        Q.  I'm just asking whether or not you were
9   advised that you were being put on
10  administrative leave for inaccuracies in a trip
11  sheet.
12       A.  I'd have to look at the form to figure
13  out which one it was.  The original form that he
14  gave me when he took my gun and everything, said
15  I was being placed because of a criminal
16  investigation.  I was told to hire an attorney.
17  I cashed out my sick leave.  I hired Seth
18  Dornier as my attorney.
19           Seth kept trying to get it -- I couldn't
20  come back to work until the Deputy Chief was
21  able to make time for me.  His mother was sick.
22  Everything like that.  Seth kept trying to make
23  appointments, they kept putting it off, putting
24  it off; and finally about three-and-a-half
25  weeks, Anthony allows Seth to meet with him.

DAVID B. HEINTZ                                    April 30, 2019

                                                              97

1          We show up.  And when I meet up with

2    them, I said, Look, this is my attorney.  We're

3    here for the criminal investigation.  I was told

4    that criminal investigation closed last week.

5    You're now on leave for a paperwork violation,

6    which is when I met with Tris Lear.

7          So that came after me and my attorney

8    showed up.  He just reworded it to put me on a

9    different kind of leave.  So still without work.

10        Q.  You were interviewed by Internal Affairs

11   with your attorney on September 20th, 2016

12   regarding the criminal investigation; weren't

13   you?

14        A.  No.

15        Q.  No?

16        A.  No.  I was told by Tris Lear that the

17   criminal investigation was closed the week

18   prior.

19        Q.  Now, I'm confused.  Because I thought

20   you just said, Deputy Chief Christiana told you

21   that the criminal investigation was closed the

22   week prior?

23        A.  I met at the trailer with Tris, Anthony

24   Christiana, Lenny Levenson were there.  They

25   cleared everybody out of the trailer and put us

DAVID B. HEINTZ                              April 30, 2019

                                                        98

1    in a room with cameras so that he (indicating)

2    could interview me with my attorney present.

3        Q.  And your attorney was Seth?

4        A.  Right.

5            MS. MCDANIEL MCGEHEE:

6            Let the record reflect when he said

7    "he," he directed his finger towards Tris Lear

8    who is sitting at the table.

9            THE WITNESS:

10           Sorry.

11   BY MR. MAUTERER:

12       Q.  I'm going to show you what I'm marking

13   as Heintz 8.  And during your last bit of

14   testimony, you were pointing at a document that

15   was in front of me and not in front of you.  So

16   I'm showing you what's Heintz 8.

17           Is that the document that you were

18   talking about when you went from administrative

19   leave on the criminal investigation to

20   administrative leave for the internal

21   investigation regarding the trip sheets?

22       A.  Yeah.  Because -- let me remember what

23   happened.  I remember having a conversation with

24   Anthony, and he said he would rewrite this

25   (indicating) for me --

DAVID B. HEINTZ                              April 30, 2019

99

1        Q.   When you're saying --

2        A.   -- and change the wording.  So I was

3   placed on administrative leave for ongoing

4   internal investigation.

5        Q.   When you were saying that the Deputy

6   Chief would rewrite this, I understand what

7   you're doing and what you're pointing at, but

8   the record doesn't.

9        A.   I'm sorry.

10       Q.   Would you identify the exhibit sticker

11  that you're talking about?  He would rewrite

12  what?

13       A.   Right.  He issued me Exhibit 6.  And

14  then when I called to find out what the status

15  was with (indicating) this, he said, That I was

16  no longer on leave for the criminal

17  investigation.  I was on for ongoing internal.

18            I asked him, I said, Well, can I get

19  that in writing.  And he said, Sure, come by the

20  office.  It will be at the front window.  So he

21  presented -- when I got to the front window at

22  200 Fifth Street, Exhibit 8 was there for me.

23            I didn't meet with anybody.  I just took

24  that and I left.

25       Q.   During this time period of being on

100

1    administrative leave, you weren't working; but

2    you were getting paid; right?

3         A.   A lesser -- what would be a lesser

4    salary, because my details were included on my

5    payroll check.  So technically, my check

6    deposits were a lot lower.

7         Q.   I just want to understand.  Your checks

8    were the same but for your details?

9         A.   Correct.  And I had to borrow a car,

10   because I had no car.

11        Q.   You were ultimately reinstated to duty

12   September 27th; isn't that correct?

13        A.   I'm not exactly sure of the date.

14        Q.   I'm going to show what I'm marking as

15   Heintz 9 and see if this refreshes any

16   recollection.  This is a letter dated September

17   27th, 2016 from the Chief and Deputy Chief -- or

18   to the Chief and Deputy Chief from Sergeant Tris

19   Lear referencing your reinstatement.

20             It says, Pursuant to instructions from

21   the Chief of Police and the Deputy Chief of

22   Police, Sergeant Lear contacted Sergeant David

23   Heintz and advised him that he was being taken

24   off of administrative leave and being restored

25   to full duty, while the internal investigation

DAVID B. HEINTZ                              April 30, 2019

101

 1    proceeded.

 2              Sergeant Heintz acknowledged those

 3    instructions and commented that he would report

 4    for duty at the Government Building on September

 5    28th, 2016 at 7:00 a.m.

 6              Do you recall that at all?

 7        A.  No.  I called Tris Lear.  He didn't call

 8    me.  I called him and asked him what the deal

 9    was, because I needed to come back to work.  At

10    which time he said, Let me make a phone call.

11    Then he called me back said, You can come back

12    to work.

13              I never saw this paper, though,

14    Exhibit 9.

15        Q.  So after you called then Sergeant Lear

16    and see what the status was, he called you back

17    and said, You're reinstated, come back to work;

18    right?

19        A.  Right.

20        Q.  And you did come back to work on

21    September 28th, 2016; right?

22        A.  Okay.  If that's the date I came back,

23    yes.  I came back when they let me come back.

24        Q.  You went to the courthouse again; right?

25        A.  Correct.

DAVID B. HEINTZ                          April 30, 2019

102

1      Q.  Now, we talked earlier about a letter

2   that's dated November 7, 2016 where you were

3   found as a result of the internal investigation

4   unsatisfactory performance of a member and

5   suspended for two days.

6           Do you remember that one?

7           MS. McDANIEL McGEHEE:

8           It's Exhibit 3.

9           MR. MAUTERER:

10          Thank you.

11  BY MR. MAUTERER:

12      Q.  Exhibit 3.

13      A.  Yes.

14      Q.  After your two-day suspension, you came

15  back and you were back on the Patrol Division;

16  right?

17      A.  No.  I served my suspension days later,

18  I think.  I don't think I served them like my

19  first day back, because there was some questions

20  as -- I was assigned to the courthouse, which is

21  8-hour days.  They put me back on the street,

22  which is a 12-hour day.

23          So I asked them while I was technically

24  suspended I was working 8-hour days, so do I

25  take 8-hour suspension.  And no, they docked me

DAVID B. HEINTZ                                    April 30, 2019

                                                             103

1    24 hours.  So I got 24 hours instead of 16.  So

2    it was maybe a week or so after I got back

3    before anybody decided to clarify.  They said

4    no, you work 12-hour shift so go home for 12.

5         Q.  Ultimately, after your suspension you

6    went back to the Patrol Division; right?

7         A.  Correct.

8         Q.  That's when you were talking earlier

9    that you were assigned under Lieutenant Brian

10   Rico?

11        A.  Yes.

12        Q.  You served in the Patrol Division under

13   Lieutenant Rico until you resigned; correct?

14        A.  Correct.

15        Q.  You resigned on or about January 5th,

16   2017; right?

17        A.  That might have been it.  I think that's

18   the date of the letter maybe.  But I don't

19   remember the exact last date I worked.  I know

20   it wasn't a full two weeks notice.  I think it

21   was a week notice or something like that.

22        Q.  Let me show you what I'm marking as

23   Heintz 10.  Is this a copy of your resignation

24   letter addressed to Chief Arthur Lawson?

25        A.  Okay.

DAVID B. HEINTZ                          April 30, 2019

                                                      104

1        Q.   Is it?

2        A.   Yes.  I'm sorry.

3             MR. MAUTERER:

4             I need to take about a five-minute

5    break.

6             MS. McDANIEL McGEHEE:

7             All right.

8             (Off the Record)

9    BY MR. MAUTERER:

10       Q.   I'm going to show you, Mr. Heintz, what

11   I'm marking as Heintz 11.  These are Responses

12   to Interrogatories that we propounded in this

13   case.

14            Take a minute and flip through them.  My

15   question to you is going to be, because it's not

16   verified by you, is everything in it true and

17   correct?

18       A.   It looks right.

19       Q.   Great.  In the course of discovery in

20   this case, Mr. Heintz, we were provided an

21   evaluation that you performed on an officer

22   Daniel Swear.

23            I'm going to show you what I'm marking

24   Heintz 12.  This is an evaluation dated December

25   30th, 2014 on Officer Daniel Swear for the

DAVID B. HEINTZ                                    April 30, 2019

                                                                105

 1     rating period July 1st, 2014 to December 31st,

 2     2014.

 3              Do you see that?

 4        A.   Yes.

 5        Q.   You and Sergeant Danielle Rodriguez

 6     performed this evaluation on Officer Swear?

 7        A.   Yes.

 8        Q.   Is everything in this evaluation true

 9     and correct to the best of your knowledge?

10        A.   Yeah.  Yeah.  The disciplinary thing was

11     on a different shift, though, not while I was

12     working.  The DR 6-2 on Page 6.

13        Q.   You were aware of that disciplinary

14     action; right?

15        A.   Yeah.  Yeah, it was --

16        Q.   At the bottom of Page 6 it says, This

17     Performance Appraisal is based on my/our

18     observations and knowledge of the employee's

19     performance.

20              Do you see that?

21        A.   Right.

22        Q.   And there's two signatures.  The bottom

23     one is yours; correct?

24        A.   No, the top one is mine.

25        Q.   The top one is yours.  All right.  Look

DAVID B. HEINTZ                              April 30, 2019

106

1    at Page 3?

2          A.   (Witness complying.)

3          Q.   Under Acceptance of Feedback, the raters

4    comments were, Has difficulty following

5    supervisors orders when he has a different

6    viewpoint or opinion.  Received disciplinary

7    action during this period.

8               That's something you and Sergeant

9    Rodriguez provided in this evaluation; right?

10         A.   Yeah.  Sergeant Rodriguez wrote the

11   thing.  If we have six policemen on the shift,

12   I'll take three; and she'll take three.  And

13   then we do them and then we sit down and compare

14   them.  And if we have something to add, we add

15   to it.  But she wrote all (indicating) this.

16         Q.   She wrote this and then you read it?

17         A.   Right.  Agreed with it and signed off on

18   it.

19         Q.   Got you.

20         A.   And that's based off of -- that's what

21   I'm saying.  I don't know if I wasn't there or

22   it was a different shift that he worked overtime

23   on, but that was -- like a pursuit or something

24   like that.  I don't remember what it was.

25         Q.   I'm just trying to understand factually

DAVID B. HEINTZ                          April 30, 2019

107

1    how this came into place.  And you're saying

2    that Sergeant Rodriguez filled it out, including

3    the Comment Sections; right?

4         A.  Right.

5         Q.  And then you were provided the completed

6    evaluation by Sergeant Rodriguez to review and

7    approve; right?

8         A.  Right.

9         Q.  So if you look at Page 6 it says, Areas

10   Needing Improvement:  Communication with

11   supervisors and following orders.

12            Do you see at the top of the page?

13        A.  Okay.

14        Q.  Do you see it?

15        A.  Yes.

16        Q.  And you approved of that statement by

17   signing off at the bottom; right?

18        A.  Right.

19        Q.  Then it says Raters Comments, down at

20   the bottom, the big paragraph, the second

21   sentence, Viewpoints and thoughts are always

22   welcome and appreciated, but problems arise when

23   he disagrees with supervisors.  On occasion has

24   had difficulty submitting to supervisory

25   authority when it doesn't match his thoughts or

DAVID B. HEINTZ                          April 30, 2019

108

1    personal beliefs on how things should be done.

2    Disciplinary action given for violations

3    triggered a shut down in the officer's

4    performance preventing progression of learning.

5          Do you see that?

6           MS. McDANIEL McGEHEE:

7           Object to the form.  You've added a

8    little word in there, but it's not exactly as

9    written.

10          Subject to that, please answer the

11    question.

12          THE WITNESS:

13          I see it, yes.

14   BY MR. MAUTERER:

15     Q.  You signed off on that performance

16   appraisal at the bottom; right?

17     A.  Right.

18     Q.  Then we talked earlier, you were the

19   subject of an evaluation in 2015; right?

20     A.  I believe so.  There was one year I

21   didn't get evaluations.  So I don't remember

22   what year that was.

23     Q.  I'm going to show you what I'm marking

24   as Heintz 13.  This is an Evaluation of Sergeant

25   Dave Heintz, dated January 1st, 2016 for the

DAVID B. HEINTZ                                    April 30, 2019

109

1    rating period July 1st, 2015 to December 31st,

2    2015.

3             Do you see that, Mr. Heintz?

4        A.   Yes.

5        Q.   The rater at the bottom was Lieutenant

6    Dean Champagne.

7             That was your lieutenant at the time;

8    correct?

9        A.   Yes.

10       Q.   And see some of the comments that

11   Lieutenant Champagne on Page 2 it says, all the

12   way at the bottom, Acceptance of Change; and

13   then it continues to Page 3.

14            Do you see that?

15       A.   Yes.

16       Q.   He wrote Comments:  Sergeant Heintz has

17   accepted change but believes it is not all

18   reasonable.

19       A.   Okay.

20       Q.   Do you know what Lieutenant Champagne

21   was talking about there?

22       A.   Let me see if this is the right one.  I

23   guess I was working for him.  Me and him had

24   issues, me and Lieutenant Champagne, had issues

25   when we were both sergeants years ago.  And then

DAVID B. HEINTZ                                    April 30, 2019

110

1    when he got promoted, they told me I was going

2    to work for him.  And we had some previous

3    issues, but we squashed it out.

4            So I guess that Acceptance of Change or

5    whatever, I adjusted to working for him.  I

6    skipped a page here.  But believes it is not all

7    reasonable.

8            During this period, he called in -- it

9    was Charlie Maynard and Arthur Fernandez

10   complaining about their low citations and

11   everything like that.  And he had me in the room

12   while he was discussing this with them; and he

13   says, Do you have any input.  I said, Nope, not

14   a bit.

15           Because, once again, I'm not pushing

16   quotas, numbers, whatever you want to call it.

17   I'm not pushing it.  So that's when he felt I

18   was disconnected and not participating in

19   punishment of the policemen, because I'm not

20   enforcing a quota.  And if he's the lieutenant

21   on his shift and he wants to preach quotas,

22   shame on him; but it's not coming out of my

23   mouth.

24           So he felt I disconnected and I wasn't

25   doing what a supervisor is supposed to do by

DAVID B. HEINTZ                              April 30, 2019

111

1    pushing numbers.

2         Q.   So it's your understanding and belief

3    that -- and I guess you're referring to Page 6

4    where he says, Sergeant Heintz is quiet and

5    seems disconnected with his subordinates.

6              You're talking about being disconnected,

7    because you wouldn't enforce a quota program?

8         A.   Yes.   And Lieutenant Champagne has a

9    reputation of, when you say something, he runs

10   off -- just runs his mouth.   So people try not

11   to talk around him.   And what Lieutenant

12   Champagne failed to see was, the people would

13   call me -- the shift will call me; and we'd go

14   meet behind the church on the expressway or

15   somewhere.   And three or four of the guys would

16   come.   We'd talk in a group, so our business

17   wouldn't be aired out on other shifts, because

18   that's not the place for it.

19             So he's thinking I'm not talking to my

20   guys.   But my guys spent more time with me than

21   they spent with their own family.   He just -- he

22   didn't see that, because we're not calling him

23   saying, Hey, bud, we're hanging out over here.

24   So he felt I was disconnected, which was far

25   from the truth.

DAVID B. HEINTZ                              April 30, 2019

                                                       112

1            I was their ears, you know; and I was

2      the mouth for them.  Every shift supervisor

3      meeting we had, I spoke up about things that

4      were going on and things that weren't right.

5            Q.  Like what?  At every meeting you had,

6      what does that mean?

7            A.  The shift supervisor's meeting, I'd --

8      once again, Louis Alvarez, he'd voice his

9      opinion in one meeting saying, you know, years

10     ago it was 10, 2, and 2 when he first started.

11     Scott Vinson trained him.  We had issues with

12     Matt Kraly doing some illegal off-the-wall

13     stuff.  It was unbelievable.

14            And when we got in the room with Dean

15     Champagne, he's telling Arthur Fernandez and

16     Charlie Maynard, Look, you need to do whatever

17     you need to do to get your numbers.  And Arthur

18     Fernandez said, I'm not going to violate

19     somebody's rights.  He said, Well, you better do

20     something, because you need to get your numbers

21     up.

22            So those kind of conversations kept

23     going on.  I'm like, man, we can't do this, you

24     know.  It's wrong, for one.  And like I said,

25     that's not what I signed up for.

DAVID B. HEINTZ                                    April 30, 2019

                                                            113

1        Q.  Any other meetings, other than the ones
2    that you've just described for me?
3        A.  We've had a few.  And like I said, after
4    the million dollar speech, everybody left; and
5    Scott Vinson was in there telling me and
6    Danielle, you all better hold up your people,
7    because I'm going to be watching.  And I'm going
8    to hold you all responsible.  Which to me meant,
9    if they didn't start writing their tickets to
10   get this million dollars going up, I was going
11   to get suspended or written up for failure to
12   supervise or unsatisfactory performance, the
13   catch-all.
14       Q.  That's what you believed?
15       A.  Yes.  And apparently everybody else did,
16   because everybody started writing a bunch of
17   tickets after that.
18       Q.  You make a statement, everybody else
19   believed.  Who believed that, and how do you
20   know?
21       A.  All the policemen that worked on my
22   shift.
23       Q.  All the people you named earlier?
24       A.  Plus more, I'm sure.  But like I said,
25   they came to me told me, Look, this is it.  You

DAVID B. HEINTZ                                    April 30, 2019

114

1    had -- Scott Vinson had his own little minions,

2    that we used to call them.  Ryan Mekdessie,

3    Dustin Vinet, this guy Kelly Landry, they would

4    come out there and work and work and work.

5    Well, if they needed a break, you know, they

6    weren't so proactive or whatever like that, well

7    then their numbers would be low.  Scott would

8    ride them, You need numbers, you need numbers.

9    Well, these guys got to the point -- Ryan

10   Mekdessie went to community policing; Dustin

11   Vinet went to community policing; Kelly Landry

12   went to home incarceration.  He was one of the

13   best policemen on the street, and he went to

14   home incarceration to babysit people.  It just

15   -- it became too much for these guys to

16   constantly work -- and, I mean, you live in

17   three-square miles, man, you know.

18          You saw the video, $6 million in a year.

19   Come on man.

20      Q.  What video?

21      A.  The fusion video.  News story.  Whatever

22   they did.

23      Q.  So you believe the fusion video is true?

24      A.  I think money is -- money is the root of

25   all evil, yes.

DAVID B. HEINTZ                                    April 30, 2019

115

1        Q.   That wasn't what I asked you.  I said,

2    do you think that the fusion video was true?

3        A.   The majority of it, yes.

4        Q.   How do you know these officers went to

5    these different positions, because they didn't

6    want to get ridden or whatever for a quota?

7             Did you have a conversation with the

8    officer that went to community policing?

9        A.   Yes.

10       Q.   Who was that again?

11       A.   Ryan Mekdessie.

12       Q.   Okay.  Did Ryan Mekdessie tell you that

13   he went to community policing, because he didn't

14   want to comply with a quota?

15       A.   He said he needed a break.  He said, I

16   need a break.  That's what everybody says, I

17   need a break.

18       Q.   I understand that.  But did he tell you

19   that the reason he needed a break was because he

20   didn't want to comply with a quota?

21       A.   Not word-for-word.

22       Q.   What did he say other than I need a

23   break, if anything?

24       A.   I'm getting burnt out.  I need a break.

25       Q.   Police work is hard; isn't it?

DAVID B. HEINTZ                        April 30, 2019

116

1       A.   Sometimes.

2       Q.   You work 12 hours a day; right?

3       A.   Right.

4       Q.   You have to deal with criminals; right?

5            MS. McDANIEL McGEHEE:

6            Is there -- I'm going to object to the

7    form.  It's not a question.

8    BY MR. MAUTERER:

9       Q.   What about the officer that went to home

10   incarceration, who was he again?

11      A.   Kelly Landry.

12      Q.   Did you have a conversation with Kelly

13   Landry where he said, I'm going to home

14   incarceration, because I don't want to follow a

15   quota?

16      A.   He needed a break.

17      Q.   Is that what he said, I needed a break?

18      A.   Yes.  He said -- not word-for-word, but

19   pretty much he -- let me see how he said it.

20           He can't continue to maintain his stats

21   like he's doing.  You know, he just -- it was

22   just getting impossible.

23      Q.   Now, I understand what you've told me;

24   and you're connected with your men; right?

25      A.   Right.

DAVID B. HEINTZ                           April 30, 2019

                                                            117

1       Q.  Why does -- I mean, in Page 6 of the

2    exhibit that's in front of you, your evaluation,

3    Raters Comments:  Sergeant Heintz has little to

4    no patience with young officers and is quick to

5    write them off.  Sergeant Heintz needs to become

6    more hands-on with guiding the young officers in

7    the right direction.

8           If you were so connected with your men,

9    why would Lieutenant Champagne say you were

10   quick to write them off?

11      A.  You'd have to ask him.

12      Q.  He didn't discuss that with you?

13      A.  No.

14      Q.  It says, Sergeant Heintz needs to become

15   more hands-on with guiding the young officers in

16   the right direction.

17          He didn't discuss that with you either?

18           MS. McDANIEL McGEHEE:

19           I'm going to object to the form of the

20   question.  It misstates what's written.

21           Answer if you can.

22           THE WITNESS:

23           No.  He just gave me the evaluation and

24   here you go, and I signed off on it.  No matter

25   what I said, he wasn't going to change it.  So

DAVID B. HEINTZ                                    April 30, 2019

118

1    -- as a matter of fact, he would wait until like

2    3:00 o'clock, 4:00 o'clock in the morning when

3    shift was almost over to try to give me this,

4    because he -- I guess, was worried about me

5    speaking out against him or whatever.

6    BY MR. MAUTERER:

7        Q.  He would worry about you speaking out?

8        A.  Like he would sit the whole shift, and

9    he would have this.  He would have it for days.

10   And then he'd send me a text, Hey, when you get

11   clear, I need to get with you on your eval.

12   Okay.  Well, I'm at the office.  Okay.  Well,

13   then two to three hours would pass by; and he's

14   doing nothing.  And then close to the end of the

15   shift, he would come in and say, Oh, let's go

16   over this real quick.  You know.

17            But it was like he was scared, because

18   he had to wait to the very last minute to give

19   it to me.  That's my perception.

20       Q.  So your perception is that he was

21   scared?

22       A.  Oh, he's -- he's intimidated.

23       Q.  He's intimidate by you?

24       A.  No, anybody.  That's his personality,

25   weak.

DAVID B. HEINTZ                                    April 30, 2019

119

1        Q.   So Lieutenant Champagne is a weak

2    officer?

3        A.   Yes.   In my opinion.

4        Q.   Do you have that opinion because he was

5    promoted over you?

6        A.   No.   Had that long before that.

7        Q.   How do you know he wasn't doing

8    anything?   You said, Lieutenant Champagne was

9    just goofing off.   He wasn't doing anything; and

10   he would come back two hours later and talk to

11   you about this, the evaluation.

12            How do you know that?

13       A.   I don't know.   I'm sure he was doing

14   something.   It wasn't police work or not on the

15   radio.

16       Q.   So he wasn't on the radio, but you don't

17   know what he was doing; right?

18       A.   No.

19       Q.   So when you say he wasn't doing

20   anything, that was --

21       A.   Not on the radio that everybody knew

22   about.

23       Q.   I'm going to show you what I'm marking

24   as Heintz 14.   This is the second part of that

25   evaluation, January 1st, 2016.

DAVID B. HEINTZ                                April 30, 2019

                                                          120

1            Do you see the Raters Comments on the

2     bottom here?

3            Sergeant Heintz seems to have recently

4     become distant and disconnected from his

5     teammates and other employees of the department.

6     Sergeant Heintz does not communicate and seldom

7     holds conversations with his fellow employees.

8     Sergeant Heintz has little to no input when

9     officers are being disciplined.

10           Do you see that?

11       A.  Yes.

12       Q.  Do you agree or disagree with those

13    comments?

14           Do you not see it on Page 7?

15       A.  Yeah.  I'm just looking for my signature

16    on it, though.

17       Q.  My question is, do you agree with those

18    comments?

19           This is a copy that was provided by your

20    attorneys.  So I don't -- I don't know how yours

21    doesn't have a signature on it.

22       A.  Okay.

23       Q.  This is the one.  So my question is,

24    there's Raters Comments on this form that was

25    provided to us in discovery, Sergeant -- and I

DAVID B. HEINTZ                                    April 30, 2019

                                                             121

 1    read them.

 2            Do you agree or disagree with those

 3    comments?

 4       A.   A portion of it.

 5       Q.   What portion do you agree with?

 6       A.   I have little to no input when officers

 7    are being disciplined.  Once again, that was the

 8    citations, bring up your numbers.

 9       Q.   That's what you attribute that statement

10    to?

11       A.   Yes.

12       Q.   Anything else that statement could be

13    attributed to, other than that you would not

14    enforce this quota or have the officers --

15       A.   The discipline?

16       Q.   Uh-huh.  (Affirmative response.)

17       A.   I don't remember disciplining anybody

18    during that period.

19       Q.   Could have been that's what he was

20    talking about, is that you didn't discipline

21    anybody for anything; did you?

22       A.   I didn't need -- oh, actually, Matt

23    Kraly.  I recommended that he be terminated for

24    -- forcing it back to retrain after the incident

25    at Murphy's Brewhouse.

DAVID B. HEINTZ                                    April 30, 2019

                                                              122

1           That was fixed by Captain Vinson when he

2    showed up.  He explained to the boy to write a

3    paper saying that he was looking for narcotics

4    intel and not looking for drunks.

5           However, the text messages to the

6    bartender said, Call me when your customers

7    leave, so I can make arrests, because I need

8    numbers for the night.

9       Q.  And is it your belief or understanding

10   that no discipline was issued for Officer Kraly

11   as a result of that event?

12      A.  Correct.

13      Q.  That's your understanding?

14      A.  I was going to write it up; and

15   Lieutenant Champagne said, I got it.  So he

16   wrote it up.  And then Scott called and said,

17   Explain to that boy, he was looking for

18   narcotics intelligence; and that's why he was

19   doing what he was doing.  Not for stats.

20      Q.  You don't know if Officer Kraly was

21   disciplined or not; do you?

22      A.  I was never told anything from that.

23   And he was never suspended off my shift, never

24   retrained, and continued to work.

25      Q.  Now, in 2015, isn't it true that both

DAVID B. HEINTZ                                    April 30, 2019

                                                              123

1     you and Sergeant Rodriguez were sergeants on the
2     Patrol Division at the same time; right?
3         A.   Yes.
4         Q.   Same team as well; correct?
5         A.   Yes.
6         Q.   So you both were supervisors of the same
7     men or women; right?
8         A.   Correct.
9         Q.   If any of the officers under your
10    supervision needed to be counseled or
11    disciplined, you put that on Sergeant Rodriguez
12    to take care of; isn't that true?
13             MS. McDANIEL McGEHEE:
14             Object to the form of the question.
15    You can answer.
16             THE WITNESS:
17             I didn't put anything off on her.
18    BY MR. MAUTERER:
19        Q.   You didn't?
20        A.   No.  If she chose to discipline an
21    officer, she had the same authority as me.
22    Actually, she was senior sergeant, because she
23    was promoted way before me.
24             So technically, she's senior sergeant.
25    If she feels she needs to discipline someone,

DAVID B. HEINTZ                                    April 30, 2019

124

1    she does it.  She doesn't need my approval.

2        Q.  You spoke poorly about Sergeant

3    Rodriguez to the men; didn't you?

4        A.  I spoke poorly to her too.  We had it

5    out.

6            MS. McDANIEL McGEHEE:

7            Wait.  Let him ask the whole question.

8    BY MR. MAUTERER:

9        Q.  My question, though, is, you spoke

10   poorly about Sergeant Rodriguez to the men;

11   right?

12           MS. McDANIEL McGEHEE:

13           Object to the form of the question.

14           THE WITNESS:

15           Yes.

16   BY MR. MAUTERER:

17       Q.  And you also said you spoke poorly to

18   Sergeant Rodriguez directly; correct?

19       A.  Yes.

20       Q.  You were the watch commander; weren't

21   you?

22       A.  My number was lower.  But like I said,

23   Sergeant Rodriguez had more time as a sergeant

24   than me, which makes her senior sergeant.

25       Q.  But you were the watch commander;

DAVID B. HEINTZ                                        April 30, 2019

                                                                    125

 1    weren't you?

 2        A.   On the paper.  Same rank.

 3        Q.   Did you think that it set a good example

 4    for the men to speak poorly about your fellow

 5    sergeant to them?

 6        A.   I can't control people's opinions of

 7    people.

 8        Q.   I understand that.  That's not my

 9    question.

10          Do you think it sets a good example as a

11    sergeant to speak poorly to the men about your

12    fellow co-sergeant?

13            MS. McDANIEL McGEHEE:

14            Object to the form.  Answer if you can.

15            THE WITNESS:

16            I don't know.  My opinion is, we're

17    grown men and women that carry guns and have the

18    right to take somebody's life.  If you can't

19    take a little criticism, then find another job.

20    BY MR. MAUTERER:

21        Q.   I understand that's --

22        A.   That's what you're saying.  We're all

23    grown men.  If you have something to say about

24    somebody, say it, you know.  And regardless of

25    your rank or anything like that, it needs to

DAVID B. HEINTZ                          April 30, 2019

126

1      come out.

2          Q.  So it wouldn't have been a better

3      leadership decision to have a private

4      conversation with Sergeant Rodriguez to air out

5      your differences with her; would it?

6              MS. McDANIEL McGEHEE:

7              Object to the form of the question.

8      Answer if you can.

9              THE WITNESS:

10             I did have a private conversation with

11     Danielle.

12     BY MR. MAUTERER:

13         Q.  And then you went and had -- and out in

14     front of everybody in the shift, a conversation

15     about Sergeant Rodriguez; didn't you?

16         A.  In the meeting, the million dollar

17     meeting?  We all talked.

18         Q.  In all shifts, you talked poorly about

19     Sergeant Rodriguez in front of all of the men

20     and women you supervised?

21             MS. McDANIEL McGEHEE:

22             Object to the form.  In all -- answer

23     if you can.

24     BY MR.  MAUTERER:

25         Q.  Didn't you?

DAVID B. HEINTZ                           April 30, 2019

                                                    127

1        A.   I've talked bad about everybody.

2   Everybody has issues.

3        Q.   Who else did you talk badly about?

4        A.   Different people.

5        Q.   Who?

6        A.   I wasn't a fan of Anthony Christiana's.

7        Q.   Who else?

8        A.   Scott Vinson.

9        Q.   Who else?

10       A.   Danielle.

11       Q.   Anybody else?

12            You said everybody.  So I want to get

13   the list.

14       A.   That's good.

15       Q.   Anybody else?

16            MS. McDANIEL McGEHEE:

17            I'm going to object to the form of the

18   question.

19   BY MR. MAUTERER:

20       Q.   Is there anybody else?

21       A.   Me and Scott Vinson used to have

22   conversations about my lieutenant, Don McCoy;

23   and Scott used to tell me that he needed to get

24   rid of him to get me promoted to lieutenant.

25            So for a captain to tell me that my

DAVID B. HEINTZ                                    April 30, 2019

                                                              128

1    lieutenant is a piece of crap and he needs to

2    get rid of him, isn't that the same thing as

3    what I was doing?

4            MS. McDANIEL McGEHEE:

5            Object to the answer.  You've got to

6    answer his question directly.

7            MR. MAUTERER:

8            You can't object to the answer.

9    BY MR. MAUTERER:

10       Q.  You spoke poorly about Lieutenant McCoy

11   too; didn't you.

12       A.  Yes.  Quite a few people did.

13       Q.  Who else?

14       A.  I don't know.  I can't recall.

15       Q.  If an officer under you was doing

16   something wrong, not -- you would -- you

17   wouldn't retrain them; would you?

18           You wouldn't help them out; would you?

19           MS. McDANIEL McGEHEE:

20           Object to the form.

21           THE WITNESS:

22           You've got to clarify that.

23   BY MR. MAUTERER:

24       Q.  Okay.  If the officers were performing a

25   particular skill and it wasn't how an officer

129

1    was taught in the Academy, would you help them

2    develop better police skills?

3         A.  Yes.

4         Q.  You would?

5         A.  Yes.

6         Q.  Can you give me any examples of where

7    you would teach an officer to help them better

8    themselves?

9         A.  I'm currently an FTO for the sheriff's

10   office.  I was an FTO for Gretna.  I was a

11   supervisor.  I taught the Academy.

12            Is that good enough?

13        Q.  Can you give me an example of while you

14   were a patrol sergeant where you would help out

15   one of the officers that was assigned to your

16   shift to teach them, so that they could aid and

17   better their career?

18        A.  You want a specific time?  I --

19        Q.  Name an officer.

20        A.  Roland Candell.

21        Q.  What did you do?

22        A.  I helped him become the well-rounded

23   policeman that he is today.

24        Q.  How did you do that?

25        A.  As a matter of fact, Scott Vinson was

DAVID B. HEINTZ                                April 30, 2019

130

1  put on special assignment; and he was to do a

2  supervisor rating with -- just he had the

3  eyeballs to see it.  He surveyed every patrolman

4  for the department.

5          After it was all done, I don't know

6  whatever happened to it.  Scott Vinson comes

7  into the office and tells me, I'm not supposed

8  to tell you the outcome of the survey he says.

9  But it started from zero or 1 being the best and

10 150 being the worst.  Scott said, He was a 26.

11 I was 32.  The very next one was 100, which was

12 Jim Price.  He said Don McCoy and Dean Champagne

13 were the 150s.

14          So if you evaluated all the supervisors

15 based off the patrolmen's perception and I

16 scored second to Scott Vinson, I think I did my

17 -- I did a fantastic job of showing these guys

18 I'm all about it.

19     Q.  And that was based on patrolmen's

20 perception; right?

21     A.  I think it was patrolmen, community

22 policing, and maybe the courthouse.  I don't

23 know.  But Scott was tasked to do that.  And he

24 said, he couldn't share the numbers with

25 anybody.

DAVID B. HEINTZ                              April 30, 2019

131

1          So do I know if I scored higher than

2     him?  Who knows.  But he said he was a 26.  I

3     was 32.  I was just six points separating me

4     from him.

5          Q.  When did this conversation take place?

6          A.  You'd have to look and see when he was

7     on special assignment.  Because he was on

8     special assignment, I think prior to him getting

9     promoted to captain; and that's when he did the

10    evaluations.

11         Q.  When you weren't promoted to lieutenant

12    in January of 2015, didn't you admit to Captain

13    Vinson that it was right for you not to be

14    promoted at that time?

15         A.  I admitted it.  Do I believe it now?

16    No.

17         Q.  Why did you admit it then, if you don't

18    believe it now?

19         A.  Because certain people have

20    personalities that control you, and Scott Vinson

21    has that personality.  What is it, narcissism?

22    Where they believe they're right and you're

23    always wrong.  He convinced me I was wrong.

24          But looking back, no, I wasn't wrong.

25    He got me.  So if I could take that day back,

DAVID B. HEINTZ                                          April 30, 2019

                                                                    132
1    I'd take it back.

2          And I think that conversation was

3    because I called Anthony an asshole and it got

4    back to him.  I said, I'm sorry for that; and

5    I'd like to apologize to the Deputy Chief.  And

6    he said, No, I'll take care of it.  And that's

7    when I went to Anthony's mother's house, she was

8    still in the hospital.  Me and him had a

9    conversation.  I told him, I said, Look, I know

10   you heard I called you an asshole; and it's

11   true.  But here's why.  And we had a discussion;

12   and he said, Okay, just we'll revisit it in

13   July, in six months.

14        Q.  At that same time that you apologized to

15   the Deputy Chief at his mother's house, you also

16   went around and apologized to Danielle Rodriguez

17   for talking bad about her to the men; isn't that

18   true?

19        A.  Yes.

20        Q.  And you also apologized to Lieutenant

21   Champagne, to Dean Champagne; didn't you?

22        A.  No.

23        Q.  No?

24        A.  No.

25        Q.  You also --

DAVID B. HEINTZ                                    April 30, 2019

                                                              133

1      A.   That was the conversation that we had to

2    try to overlook the stuff that happened a year

3    before or whatever.  It wasn't -- I didn't

4    apologize.  But I knew I had to work for him, so

5    I met him at his house.  We talked.

6            He said, Look -- and he actually

7    apologized because -- during Heritage Fest, he

8    was telling stories about me to other people or

9    whatever, and then it got back.  And it was Jim

10   Price and Dean Champagne talking trash about me,

11   and I had enough.  So we brought him into

12   Lieutenant Jackson -- I mean Captain Jackson, he

13   was captain at the time -- brought him in there.

14   I confronted Jim Price.  I said, Look, this has

15   got to stop, man.  And I said, You know, you're

16   talking trash about me in your office.  Guys are

17   coming back telling what you're saying.  It's

18   got to stop.

19           At which Jim says, You're right.  You're

20   absolutely right.  I'm sorry.  We've been

21   friends for 20-something years.  We shook hands.

22   We called Dean in.  And Jim already admitted

23   they were doing it; and Dean stood right there

24   and goes, I didn't say that.  I said, Really.

25   Your friend just ratted you out saying you all

DAVID B. HEINTZ                                April 30, 2019

134

1    had the conversation.

2            So I had no trust for this dude, because

3    he can't even man up when he got confronted with

4    the truth.

5            So then when Dean gets promoted, Scott

6    said, You know, you're going to have to work

7    with him.  You might want to call him.  So I

8    called him, went to his house, we talked.  And

9    he had bought my wife's house when she was

10   growing up, and he was remodeling it.  We looked

11   at the house.  All right, man.  See ya.  Never

12   apologized.  I didn't have anything to apologize

13   for.

14       Q.  The trash that you say Dean Champagne

15   and Price were talking about, that had nothing

16   to do with quotas or improprieties or anything

17   else?

18       A.  No.  It had to do with running Heritage

19   Fest.

20       Q.  Now, you have given me examples of

21   people talking trash; but you would call

22   officers stupid behind their back; didn't you?

23       A.  Help me out.  Like who?

24       Q.  You don't recall ever referring to any

25   officers that were under you as stupid?

DAVID B. HEINTZ                                    April 30, 2019

                                                            135

1        A.   No.

2        Q.   You don't remember that.

3             MR. MAUTERER:

4             Off the record.

5             (Off-the-record Discussion.)

6    BY MR. MAUTERER:

7        Q.   I'm going to show you, Mr. Heintz, what

8    I'm marking as Heintz 15.  These are copies of

9    your paycheck check stubs from the City of

10   Gretna from February 25th to the time you

11   resigned, January 12th, 2017.

12       A.   Okay.

13            MS. McDANIEL McGEHEE:

14            I'm sorry, this is indicated that it's

15   from January 2Oth, 2017.

16            MR. MAUTERER:

17            Right, that's when it ends.  That's

18   when the check was cut.

19            MS. McDANIEL McGEHEE:

20            So the last one I have is 3/4/16; is

21   that right?  On 673, the last page.

22            MR. MAUTERER:

23            Correct.  So the Bates number, just so

24   everybody is clear, is GPD_Heintz 648 to 673.

25   So everybody is clear.

DAVID B. HEINTZ                          April 30, 2019

                                                              136

1    BY MR. MAUTERER:

2        Q.  Now, if you look at 673, the last page

3    in that stack, you were talking about your

4    details earlier, that's reflected on this check;

5    right?

6        A.  Right.

7        Q.  So that's an example of a detail being

8    paid through your check; correct?

9        A.  Correct.

10       Q.  Now, we talked about how you were placed

11   -- you were transferred to the courthouse in

12   August of 2016; right?

13       A.  Right.

14       Q.  We saw that through one of the exhibits

15   through your deposition.  If you would look at

16   Bates Number 660, this is your paycheck that

17   starts August 25th, 2016 and it actually ends

18   when it's paid September 2nd, 2016.

19           During this time that you were at the

20   courthouse, you worked 36 hours of overtime.

21           Do you see that on your pay stub?

22       A.  Yeah.

23       Q.  Now, while you're at the courthouse,

24   you're still also receiving your patrolman pay;

25   correct?

DAVID B. HEINTZ                              April 30, 2019

137

1          A.   As far as I know.

2          Q.   Look at it, it's the fourth line down.

3               Do you see on the left-hand side, fourth

4     line down?

5          A.   Right.

6          Q.   It says Patrolman, $92.31.

7          A.   Okay.

8          Q.   You received your patrolman pay

9     throughout your entire time that you were at the

10    courthouse; didn't you?

11         A.   Apparently.

12         Q.   Even though you weren't actually

13    patrolling the streets at that time; correct?

14         A.   Right.

15         Q.   When you were on administrative leave,

16    you also continued to get that pay; isn't that

17    true?

18              If you look at Bates Number 658, you go

19    on administrative leave for the criminal case on

20    September 1st, 2016.  Here's a paycheck here.

21    You're still getting your patrolman pay of

22    $92.31; correct?

23         A.   Okay.

24         Q.   You still got a detail check on this

25    paycheck too, $250; right?

DAVID B. HEINTZ                          April 30, 2019

138

1      A.   Right.

2           MS. McDANIEL McGEHEE:

3           I'm going -- 658.  I'm sorry, I'm on

4    the wrong page.

5    BY MR. MAUTERER:

6      Q.   You still have health insurance during

7    the time period that you're on administrative

8    leave; right?

9      A.   Yes.

10     Q.   Still being provided retirement during

11   your time you're on administrative leave; right?

12     A.   Yes.

13     Q.   Still accruing vacation time and sick

14   time while you're on administrative leave;

15   right?

16     A.   Yes.

17     Q.   You get transferred from the

18   administrative leave for the criminal

19   investigation to the internal investigation, we

20   talked about that, on September 22nd, 2016.

21           If you look at your paycheck for that

22   period, it's Bates Number 657, you're still

23   getting patrolman pay during that time; right?

24     A.   Yes.

25     Q.   Still getting retirement; right?

DAVID B. HEINTZ                              April 30, 2019

139

1        A.   Yes.
2        Q.   And your health insurance is paid for;
3    right?
4        A.   Yes.
5        Q.   You're still accruing vacation and sick
6    time; right?
7        A.   No.   According to this I lost 494.46
8    hours.   It says Earned, negative, 494.46.   So I
9    didn't incur anything.   I lost it.
10       Q.   Isn't that when you took out 500 hours
11   to pay for Seth Dornier?
12       A.   Yes.
13       Q.   That's reflected on 659, the Bates
14   Number 659.
15       A.   No, it's 657.
16       Q.   I understand.   Look at Page 659 and
17   we'll carry it forward.
18       A.   But your question was, did I accumulate
19   it; and it's showing a negative result on that
20   657.
21       Q.   And you cashed in some of that time
22   on --
23       A.   Correct.
24       Q.   On 659, you cashed in 500 hours; right?
25            MS. McDANIEL McGEHEE:

DAVID B. HEINTZ                                April 30, 2019

                                                        140

1              I don't see that.  I object to the

2       form.

3              MR. MAUTERER:

4              659, you don't see Gross Separation 500

5       hours, $5,684.25 on Bates Number 659?

6              MS. McDANIEL McGEHEE:

7              It says, Vacation balance 506, earned

8       5.54, current balance 512.22.

9              Am I looking at the wrong thing?

10             MR. MAUTERER:

11             Yes.  659.

12             MS. McDANIEL McGEHEE:

13             Oh, I see.  Separation or separati.

14      Okay.

15      BY MR. MAUTERER:

16         Q.  If you look at Bates Number 656, during

17      this pay period you're back at the courthouse.

18      This is your pay period starting October 6, 2016

19      and you're paid on October 14th.  You're back at

20      the courthouse now.  You're working overtime

21      again at the courthouse.  You have another

22      seven-and-a-half hours; right?

23         A.  Yes.

24         Q.  You got a detail paycheck on that

25      paycheck too; right?

DAVID B. HEINTZ                                    April 30, 2019

141

1        A.   Yes.

2        Q.   You still got your patrolman time, even

3   though you're at the courthouse; right?

4        A.   Okay.

5        Q.   If you look at 655, this is your pay

6   period starting October 20th, 2016.  You're

7   still at the courthouse.  You've got overtime of

8   49.5 hours on that paycheck; right?

9        A.   Yes.

10       Q.   You still got your patrolman pay as

11   well; right?

12       A.   I don't know how much of that overtime

13   was the Heritage Fest either, because October is

14   Heritage Fest.  So you'd have to figure that

15   out.  It all goes in your overtime.  I mean,

16   that's two full days of 16-18 hours.  And that's

17   mandatory we work it.

18       Q.   Heritage Fest is usually in the

19   beginning of October, like the 2nd, 3rd, and

20   4th, the first week in October; isn't it?

21       A.   Yeah.  By the time they calculate

22   payroll and everything like that, it's not

23   guaranteed to be on your first check.

24       Q.   You don't have anything today that would

25   prove that this 49.5 hours is a result of your

DAVID B. HEINTZ                                    April 30, 2019

142

1    working the Heritage Festival and not overtime

2    at the courthouse; do you?

3        A.   No, I can't prove it.  Like I said, the

4    time frame would fit.  But there's no other time

5    with me getting that many hours overtime.

6        Q.   Other than the time period on 660 when

7    you first started at the courthouse, you got 36

8    hours.

9        A.   Okay.

10       Q.   Going back to Bates Number 655 where we

11   were, you're still getting a detail paycheck on

12   that one as well; right?

13       A.   Yeah.  I continued working my Entergy

14   detail as much as I could even being reassigned

15   to the courthouse.  But then when Shannon Dugas,

16   I think he went on vacation, which is where my

17   overtime started going up, because he was gone.

18   I couldn't cover my details anymore.

19       Q.   When you were on administrative leave

20   for the criminal investigation, you still got a

21   detail check.

22            On 658, it shows a detail being paid of

23   $250?

24       A.   Okay.

25            MS. MCDANIEL MCGEHEE:

DAVID B. HEINTZ                          April 30, 2019

143

 1          That was the criminal?  I thought you
 2     said administrative was 658.
 3               MR. MAUTERER:
 4               He was on administrator leave for the
 5     criminal investigation from September 1st to
 6     September 21st.  So his pay period that included
 7     that was 658.
 8     BY MR. MAUTERER:
 9          Q.  You've got a detail payment, do you see
10     that, on 658?
11          A.  Uh-huh.  (Affirmative response.)
12          Q.  That's a yes?
13          A.  Yes.
14          Q.  All right.  Now, when he's on
15     administrative leave for the internal
16     investigation, the next one, 657, there's no
17     detail payment on that one; right?
18          A.  Right.
19          Q.  You're back at the courthouse for 656.
20     There's a detail payment on 656; right?
21          A.  Okay.
22          Q.  Do you see it?  Don't just agree with
23     me.  I want you to be able to see it.  Bates
24     Number 656.
25          A.  No, I see it.

DAVID B. HEINTZ                                    April 30, 2019

144

1       Q.   Okay.  Then 655, there's a detail
2   payment on that one as well; right?
3            That's where we ended off with the
4   overtime of 49.5 hours.  There's a detail
5   payment on 655; correct?
6       A.   Right.
7       Q.   Then on 654, right before you go back to
8   the patrol, you have 18 more hours of overtime
9   at the courthouse; right?
10      A.   Okay.
11      Q.   So when I calculated your overtime hours
12  up for this period of February 25th, 2016 to
13  January 20th, 2017, I calculated 177.5 hours of
14  overtime.
15           Do you disagree with that in any way?
16      A.   I'd have to look at the numbers to
17  figure it out myself.
18      Q.   My question, though, is, while you were
19  at the Courthouse Security, you worked 111 of
20  those 177 hours of overtime; didn't you?
21      A.   I don't know.
22      Q.   These are accurate pay records, though,
23  as far as you know; right?
24      A.   Right.
25      Q.   When did you decide to start looking for

DAVID B. HEINTZ                                    April 30, 2019

145

 1    employment at the sheriff's office?

 2         A.   I don't recall.

 3         Q.   Do you remember when you applied?

 4         A.   No.

 5         Q.   Now, remember the letter you were put on

 6    suspension on November 7, 2016, because of the

 7    internal investigation.

 8              Do you remember we went over that;

 9    right?

10         A.   Okay.

11         Q.   You remember after that suspension you

12    were assigned for Lieutenant Rico at the Patrol

13    Division; right?

14              You remember us talking about that?

15         A.   Okay.

16         Q.   You remember that?

17         A.   (Witness nodded head in the

18    affirmative.)

19         Q.   Okay.

20              I'm going to show you what I'm marking

21    as Heintz 16.  This is your Application for

22    Employment with the sheriff's office dated

23    November 17, 2016.

24              Does that sound about right?

25         A.   That's what it says on the paper.

DAVID B. HEINTZ                                    April 30, 2019

                                                        146

1        Q.   That's your handwriting?

2        A.   Yes.

3        Q.   So within 10 days after receiving your

4    notice of two-day suspension, you had applied at

5    the sheriff's office, according to this

6    document; isn't that correct?

7        A.   That's the date on the paper.  I can't

8    tell you if that's when I turned it in, though.

9        Q.   That's the day that you signed it;

10   right?

11           Look at --

12       A.   No, I saw that.  But that doesn't mean I

13   submitted it to JP on that date.  That's the

14   date I've got on there.

15       Q.   Let's back up so the record is clear.

16   Bates Number 456 has a date of 11/17/2016 and

17   your signature next to it; correct?

18       A.   Right.

19       Q.   So at least that's the date -- we can

20   establish that's the day you signed the

21   application.  Fair enough?

22       A.   Okay.

23       Q.   All right.  I'm going to show you what

24   I'm marking as Heintz 17.  This is a handwritten

25   statement also dated November 17th, 2016.

DAVID B. HEINTZ                                    April 30, 2019

147

1          Is that your signature?

2       A.   Yes.

3       Q.   Now, I'll represent to you, as your

4    lawyer knows, we obtained this through a

5    subpoena to Jefferson Parish Sheriff's Office;

6    and some of the things because of privacy are

7    redacted.  That's why there's black marks on it.

8    I did not redact that.  The sheriff's office

9    did.

10         My question, though, is, the top part,

11   is that your handwriting?

12      A.   Yes.

13      Q.   You're explaining to the sheriff's

14   office that in 2014 you were involved in a

15   pursuit of four armed robbery suspects, and you

16   were involved in a gunfight in which I shot two

17   of the suspects.

18         Do you see that?

19      A.   Yes.

20           MS. McDANIEL McGEHEE:

21           I'm going to object to the form of the

22   question.

23           Answer if you can.

24   BY MR. MAUTERER:

25      Q.   And you say the trials are over and they

KAY E. DONNELLY & ASSOCIATES
504.299.8220

DAVID B. HEINTZ                              April 30, 2019

148

1   were convicted.

2          Is that what it says?

3      A.   Yes.

4      Q.   So as far as you know on November 17th,

5   2016, the guys you shot at, the suspects, had

6   already been convicted; right?

7      A.   We had gone to trial for it, yes.

8      Q.   It says, I was cleared by my department

9   as well as N.O.P.D., who investigated the

10  shooting; right?

11     A.   Right.

12     Q.   Did you ever tell JPSO that the suspects

13  that you shot at were unarmed?

14     A.   They had a gun.

15     Q.   Did you ever --

16         MS. McDANIEL McGEHEE:

17         Wait, I'm going to object to the form

18  of the question.  It presumes facts not in

19  evidence.

20  BY MR. MAUTERER:

21     Q.   Did you ever tell JPSO that the suspects

22  that you shot at in 2015 were unarmed?

23         MS. McDANIEL McGEHEE:

24         I'm going to object to the form of the

25  question.  It misstates facts in evidence.

DAVID B. HEINTZ                                April 30, 2019

149

1    BY MR. MAUTERER:

2         Q.   You can answer.

3              MS. McDANIEL McGEHEE:

4              It wasn't in 2015, and he's already

5    testified that they did have a gun.

6              MR. MAUTERER:

7              I didn't say 2014, and it's an improper

8    objection.  You can't instruct him not to

9    answer.

10             MS. McDANIEL McGEHEE:

11             I can if it misstates the facts.  It

12   says 2014 right (indicating) here.  Steve, you

13   said 2015.

14             MR. MAUTERER:

15             I'm saying 2014.

16   BY MR. MAUTERER:

17        Q.   In 2014 --

18             MR. MAUTERER:

19             Maybe you misheard.

20    BY MR. MAUTERER:

21        Q.   In 2014, did you ever tell -- let me

22   back up.

23             In 2016 when you signed this statement,

24   did you ever tell JPSO that in the year 2014 you

25   shot at suspects that were unarmed?

DAVID B. HEINTZ                                April 30, 2019

                                                             150

1        A.  I told them I was involved in a
2   shooting.
3        Q.  Did you tell JPSO that the suspects you
4   shot at in 2014 unarmed?
5        A.  Why would I tell them they were unarmed?
6   They were armed.
7        Q.  Did you tell them -- then the answer is
8   yes or no?
9        A.  No.
10       Q.  No, you didn't tell them that?
11       A.  No.
12       Q.  Did you tell them that you were sued,
13   because you shot these men?
14       A.  I was never served a suit for this.
15   When I did, Gretna never responded back to me.
16   I got it, and I -- it was after I was already
17   employed with the sheriff's office --
18       Q.  Are you trying to say --
19       A.  -- if I'm not mistaken.
20            MS. MCDANIEL MCGEHEE:
21            Wait, wait, wait.
22    BY MR. MAUTERER:
23       Q.  I'm sorry.
24            MS. McDANIEL McGEHEE:
25            Go ahead.

DAVID B. HEINTZ                              April 30, 2019

151

1    BY MR. MAUTERER:

2        Q.  Go ahead.

3        A.  I remember getting served.  I don't

4    remember when it was.  But when I did speak to

5    Gretna's counsel, I think it was Lenny, he told

6    me that the time had passed; and he wasn't able

7    to pursue the civil case.

8        Q.  I'm going to ask you if this is what you

9    got served with.  (Heintz Number 18)

10           You say you got served with something.

11   Is this what you got served with?

12       A.  It looks right.

13       Q.  I'm sorry, I didn't understand you.

14           What did you say, I'm sorry?

15       A.  Yeah, I got a copy of this.  My timing

16   was off -- another mistake.

17           Because it's dated while I was still

18   working for the City of Gretna, if I'm not

19   mistaken.

20       Q.  It looks to me as January 13th, 2015 at

21   the top.

22           MS. McDANIEL McGEHEE:

23           Where are you looking at?

24           MR. MAUTERER:

25           On the first page under, Filed.

DAVID B. HEINTZ                                    April 30, 2019

                                                              152

1              MS. McDANIEL McGEHEE:

2              Let the record reflect that the

3    document has Filed over another part of the 41st

4    Judicial District Court.

5              So your question is, it looks like it

6    was January 13th, 2015, Steve, is that what the

7    question is?

8              MR. MAUTERER:

9              No.  I was answering him.  He didn't

10   know when it was filed.

11             MS. McDANIEL McGEHEE:

12             Okay.

13   BY MR. MAUTERER:

14      Q.  But my question -- and I think he

15   answered it -- was, he remembers being served

16   with this lawsuit; right?

17      A.  Yeah.  That's why they had me write

18   (indicating) this.  Now, that you're talking

19   about it.

20             When I turned in my application, I told

21   them, I said there's still a chance there's a

22   civil suit; but I was advised by Lenny Levenson

23   that it had passed the year date and he couldn't

24   do it.  He said, Well, look, take this

25   (indicating) piece of paper and explain to me

DAVID B. HEINTZ                              April 30, 2019

153

1    what happened.  So that's what this (indicating)

2    is.

3         Q.  The part that's not redacted doesn't say

4    anything about this lawsuit.

5             Do you remember if the part that's

6    redacted says anything about this lawsuit?

7         A.  It might.  Like I said, the reason he

8    told me to write it was, because I said, Look,

9    there's a civil suit out there that was supposed

10   to be dismissed.  So he said just fill that out

11   and attach it to it.

12        Q.  And at least the claim in this lawsuit

13   was that the man that you shot was unarmed;

14   right?

15        A.  Dale Brown was the driver, correct,

16   unarmed.

17        Q.  The City of Gretna defended you in this

18   lawsuit; didn't they?

19        A.  I never heard back from them.  Lenny

20   Levenson represented me, and I never heard back

21   from him.

22        Q.  You didn't have to hire your own lawyer;

23   did you?

24            MS. McDANIEL McGEHEE:

25             I'm going to object to the form of the

DAVID B. HEINTZ                                April 30, 2019

154

1    question.

2             Go ahead, answer if you can.

3             THE WITNESS:

4             No.

5    BY MR. MAUTERER:

6        Q.  The City of Gretna did not fire you as

7    the result of this lawsuit; did they?

8        A.  No.

9        Q.  The City of Gretna did not discipline

10   you as the result of this lawsuit; did they?

11       A.  No.  They gave me a medal.  A Medal of

12   Valor.

13       Q.  Medal of Valor is not a bad thing; is

14   it?  That sounds pretty good.

15       A.  That's like a prestigious -- other than

16   getting killed in the line of duty, I think it

17   rates the second one.

18       Q.  When were you awarded the Medal of

19   Valor?  Was it in '14 or '15?

20       A.  Honestly, I don't know.  I got a picture

21   of it, but I don't know when it was taken.  It's

22   a -- during the graduation of one of the Academy

23   classes.

24       Q.  Do you remember -- just trying to narrow

25   it down, was it before you got served with the

DAVID B. HEINTZ                                    April 30, 2019

155

1    lawsuit?

2         A.  Honestly, I don't know.

3         Q.  Be that as it may, your involvement in

4    this incident with these men resulted in you

5    being awarded a Medal of Valor by the Gretna

6    Police Department; right?

7         A.  Correct.

8         Q.  After you submitted your application to

9    the sheriff's office, you were provided -- were

10   you provided an Offer of Employment?

11        A.  Yes.

12        Q.  I'm going to show you what I'm marking

13   as Heintz 19.  This is a Conditional Offer of

14   Employment to Davie Heintz.

15            That's you; right?

16        A.  Uh-huh.  (Affirmative Response.)

17        Q.  Dated November 22nd, 2016.  And it

18   provides your salary that you're going to get;

19   correct?

20        A.  Correct.

21        Q.  You accepted the Offer of Employment;

22   right?

23        A.  Right.

24        Q.  Because you're working there today;

25   correct?

DAVID B. HEINTZ                                    April 30, 2019

                                                              156

 1        A.   Yes.

 2        Q.   Now, you didn't work for free for the

 3   sheriff's office; did you?

 4             You got paid; right?

 5        A.   Right.

 6        Q.   I'm going to show you what I'm marking

 7   as Heintz 20.  Heintz 20 is your 2017

 8   Year-to-Date Payroll Records with the Jefferson

 9   Parish Sheriff's Office.

10             MS. McDANIEL McGEHEE:

11             He's just represented that to you.

12   BY MR. MAUTERER:

13        Q.   Do you recognize these as your pay

14   summary?

15        A.   That's not how I see it.  But okay.

16        Q.   It says Earnings History Register on top

17   of it, and I will represent to you we've

18   obtained this from Jefferson Parish Sheriff's

19   Office pursuant to a subpoena to them.

20             If you look at what's been Bates

21   Numbered 636, it's the second to last page?

22        A.   (Witness complying.)

23        Q.   It shows checks from January 1, 2017 to

24   December 31st, 2017.  So the entire year of

25   2017, there was a gross pay of $52,911.29.

DAVID B. HEINTZ                          April 30, 2019

157

1          Do you see that?
2      A.  No.
3           MS. McDANIEL McGEHEE:
4           (Indicating.)
5           THE WITNESS:
6           Oh, okay.
7           MS. McDANIEL McGEHEE:
8           Let the record reflect I pointed to
9    where it says Gross Pay in the document labeled
10   636.
11   BY MR. MAUTERER:
12     Q.  I'm going to show you what I'm marking
13   as Heintz 21.  These are copies of your 2016 Tax
14   Returns that we obtained in discovery.  For the
15   record, your Social Security Number as well as
16   that of your children has been blacked out.
17   Okay?
18     A.  Okay.
19     Q.  If you look at the last page of that
20   exhibit, it has a Bates Number of D.Heintz 326?
21     A.  (Witness complying.)
22     Q.  It shows that you obtained -- or earned
23   $82,899 from the City of Gretna in 2016.
24          Do you see that?
25     A.  Yes.

DAVID B. HEINTZ                              April 30, 2019

                                                              158

1        Q.   And then your wife worked for Southern

2    Images in 2016?

3        A.   According to this.   Okay.

4        Q.   And her wages are there, $18,161; right?

5        A.   Right.

6        Q.   That totals together $101,060, which is

7    the same amount that's on the front page of your

8    1040 Tax Return under Line 7?

9        A.   Okay.

10       Q.   Do you see that?

11       A.   Yes.

12            MS. McDANIEL McGEHEE:

13            You looked at 22.   He said Line 7.

14   That's (indicating) 22.   That's (indicating) 7.

15   That's what he asked you about.

16            THE WITNESS:

17            Okay.

18            MR. MAUTERER:

19            All right.

20   BY MR. MAUTERER:

21       Q.   So at least in 2016 you're reporting to

22   the Internal Revenue Service that you made

23   $82,899 from the Gretna Police Department;

24   right?

25       A.   According to this, yes.

DAVID B. HEINTZ                                    April 30, 2019

159

1        Q.  I'm going to show you what I'm marking

2    as Exhibit 22.  This is a copy of you and your

3    wife's 2017 Tax Returns that we obtained in

4    discovery.  And, again, I've redacted your

5    Social Security numbers and that of your kids.

6            If you look at the last page, which has

7    a Bates Number of D.Heintz 356, it has the same

8    summary -- or similar summary as the one we were

9    just talking about; right?

10       A.  Right.

11       Q.  So in 2017, you report for yourself to

12   the IRS three different sources of income, one

13   being the City of Gretna; correct?

14       A.  Correct.

15       Q.  That was that time period before your

16   resignation in 2017 you earned $8,462 according

17   to your tax return; right?

18       A.  Yeah.  Whatever vacation and stuff was

19   paid to me.

20       Q.  In 2017?

21       A.  Right.

22       Q.  So whatever you earned in 2017 is

23   reported on your 2017 taxes; right?

24       A.  Right.

25       Q.  Then it has Rouse's Enterprises and

DAVID B. HEINTZ                                    April 30, 2019

                                                            160

1    $12,484.  That was details that you were

2    performing while you were with the Jefferson

3    Parish Sheriff's Office in 2017; right?

4         A.  Correct.

5         Q.  And then you have your sheriff's office

6    pay, at least on here it says $43,324; right?

7         A.  Right.

8         Q.  The question is, the $43,324 does not

9    match what the Jefferson Parish Sheriff's Office

10   says they paid you in 2017 that's reflected in

11   the prior exhibit; does it?

12        A.  No.

13             MS. McDANIEL McGEHEE:

14             Which exhibit?

15             MR. MAUTERER:

16             This one right (indicating) here.

17             THE WITNESS:

18             No, I know.  But I don't know because I

19   paid my pension and all into things like that.

20   I don't know if it's taxable or not.  I don't

21   understand.

22             But, I mean, everything goes to my tax

23   people with the W-2s and stuff like that.  I pay

24   -- I'd have to look at my check stub,

25   400-and-something dollars a month to my pension

DAVID B. HEINTZ                                    April 30, 2019

                                                              161

1    now.  So I don't know if that's --

2    BY MR. MAUTERER:

3        Q.  My question is -- and I understand a CPA

4    may have different statements or opinions.

5            My question is, the gross pay amount

6    that's listed on your paycheck stubs from the

7    Jefferson Parish Sheriff's Office Registry that

8    we just went through of $52,911.29 is not listed

9    on your 2017 Tax Returns, Page 356?

10           MS. MCDANIEL MCGEHEE:

11           So I'm sorry, I'm going to object to

12   the form.  And ask to rephrase the question, I

13   don't understand it.

14   BY MR. MAUTERER:

15       Q.  My question is simple.  That $52,000

16   isn't reflected on your tax return.  It's a yes

17   or no answer.

18       A.  No, it's not.  I don't know why.

19       Q.  In 2017, you worked additional details

20   other than Rouse's; didn't you?

21       A.  I'm trying to remember.  I think I

22   worked a FEMA warehouse.  I don't know what

23   else.

24       Q.  Let me see if I can help you.  This is

25   Heintz 23.  This is a listing of all your

DAVID B. HEINTZ                           April 30, 2019

162

1    details we obtained from Jefferson Parish

2    Sheriff's Office for 2017 and the amounts you

3    were paid.

4          In addition to Rouse's, it shows that

5    you also worked for Keith's Electric Contractors

6    in 2017.

7          A.  Okay.

8          Q.  That's not reported on your tax return;

9    is it?

10              MS. McDANIEL McGEHEE:

11              I'm going to object to the form of the

12   question.

13   BY MR. MAUTERER:

14         Q.  The income that you received from

15   Keith's Electric Contractors isn't reported on

16   your 2017 Tax Returns; is it?

17         A.  No.  I never got a tax form from them.

18         Q.  Also on your details you worked for

19   Ochsner.

20              Do you see that?

21         A.  Yes.

22         Q.  The income, which I've calculated to be

23   roughly $2,344 is not reported to your 2017 Tax

24   Returns; is it?

25         A.  I don't see it on here.  If I got the --

163

1    it would be nice if I had W-2s or 1099s attached

2    to it.

3        Q.  I also see according to the Detail Sheet

4    from Jefferson Parish Sheriff's Office that you

5    worked at Select Physical Therapy.  I've

6    calculated that as $300 on that sheet.

7            There's no entry for the income you

8    received from Select Physical Therapy on your

9    tax returns in 2017; is there?

10       A.  No.  They paid me cash.

11       Q.  I also see that you earned, and I

12   calculated $240 from Tulane in 2017.

13           That's not reported in your tax returns

14   either; is it?

15       A.  I have no idea what that's from.

16       Q.  Did they pay you cash as well?

17           MS. McDANIEL McGEHEE:

18           You have to answer out loud.  So she

19   can --

20           THE WITNESS:

21           No.  I've never -- Tulane Lakeside?

22   I've never worked Tulane.  Unless it was a

23   hospital taken over from Ochsner.  But I don't

24   remember ever working Tulane.  I see another one

25   on here.

DAVID B. HEINTZ                                    April 30, 2019

164

1    BY MR. MAUTERER:

2        Q.   Tulane is on there a few times that you

3    worked.

4        A.   I'm telling you, I don't remember ever

5    working at Tulane.  Because with the details,

6    you have to go through the company.  Like

7    Rouse's, I'm a Rouse's employee.  With Ochsner,

8    I'm an Ochsner employee.  With Tulane, you have

9    to be a Tulane employee.  I'm not registered at

10   Tulane.  I don't know if this is a typo and

11   somebody's getting over on me.

12       Q.   Unless Ochsner acquired Tulane in 2017?

13       A.   Well, it was Ochsner Clinic and Ochsner

14   Hospital, like I said.  But I've never

15   registered or signed up for Tulane.  And Tulane

16   Lakeside has their own security there anyway.

17   They have their own Tulane police officers.

18   It's in my beat.

19            MS. McDANIEL McGEHEE:

20            If you don't know, you can just say I

21   don't know.

22            THE WITNESS:

23            Okay.

24            MS. McDANIEL McGEHEE:

25            He's asking you for tax advice.  I'm

DAVID B. HEINTZ                                    April 30, 2019

165

1    going to object to the line of questioning.

2              MR. MAUTERER:

3              It wasn't a question.  So we'll move

4    on.

5              MS. McDANIEL McGEHEE:

6              Then I'm going to object to the

7    statements made by Counsel.

8              MR. MAUTERER:

9              She likes to object just to object.

10   BY MR. MAUTERER:

11       Q.  Also I see BRG on your Detail Sheet.

12   It's on the last page, 642.  There's several of

13   them -- one, two, three, four, five BRGs.  $840

14   worth of income from BRG.

15             Did you report that on your tax returns?

16       A.  Yeah.  That was the FEMA warehouse.

17       Q.  Is that reported on your tax returns?

18       A.  I supplied my tax person with the tax

19   forms.

20             MS. MCDANIEL MCGEHEE:

21             So the answer is, I don't know; right?

22             THE WITNESS:

23             Okay, I don't know.

24   BY MR. MAUTERER:

25       Q.  So when I calculate based on the

DAVID B. HEINTZ                                    April 30, 2019

                                                              166

1    Sheriff's Office Register and all of the

2    details, your income for 2017, at least gross

3    income, was $77,791.29 after I add all of those

4    things together.

5            That's different from what's on your tax

6    returns of $64,270; right?

7        A.   It's different.

8        Q.   You don't know why?

9        A.   No.

10       Q.   It's just different?

11       A.   Right.

12       Q.   Now, in your discovery responses,

13   Mr. Heintz, you stated that you're seeing a

14   counselor as a result of -- you're seeing a

15   counselor and you're attributing you going to a

16   counselor as the result of what allegedly

17   happened at the Gretna Police Department.  And

18   you identified a counselor by the name of Tim

19   Kemery.

20           Are you seeing a Tim Kemery?

21       A.   Yes.

22       Q.   Do you remember when the first time was

23   that you saw Mr. Kemery?

24       A.   No, I don't remember.

25       Q.   Do you remember why you started seeing

DAVID B. HEINTZ                          April 30, 2019

167

1    Mr. Kemery?

2        A.  I was having trouble sleeping, having

3    some depression, started drinking a lot.

4        Q.  Did you --

5        A.  I --

6        Q.  I'm sorry.

7        A.  I went to a school, a seminar; and it

8    was about police coping with the career and the

9    lifestyles, everything like that.  One of the

10   guys got up there and they started talking about

11   suicide in police work.  And it's a triangle.

12          So as he started, you know, financial

13   issues, martial issues, drinking, this.  And it

14   got close to the top where you put the gun in

15   your mouth.  I was getting up there.  I'm sorry.

16          Me and my captain were talking, and he

17   could see it.  He said, Look, I'm going to give

18   you a number to call somebody.  So I went and

19   met with Dr. Kemery.

20       Q.  Your captain, was that Captain Kinler?

21       A.  Yes.  We've been friends for

22   20-something years.  He's the godfather of my

23   child.  He knew something wasn't right.

24          It's embarrassing, man.

25       Q.  I'm going to show you what I marked as

DAVID B. HEINTZ                                    April 30, 2019

168

1   Heintz 24.  These are copies of records we

2   received from Tim Kemery, LCSW.

3              MS. McDANIEL McGEHEE:

4              Do you need to take a break?

5              THE WITNESS:

6              I'm good.

7              MS. McDANIEL McGEHEE:

8              All right.

9   BY MR. MAUTERER:

10      Q.  Just let me know.

11      A.  (Witness nodded head in the

12   affirmative.)

13              It makes me feel weak.  You know, I --

14   I'm sorry, go ahead.

15      Q.  Bates Number 442, it's the second page

16   of Exhibit 24.  It says, Deputy Heintz was first

17   seen in our office on July 9th, 2018.

18              Do you have any reason to believe that

19   that date is inaccurate?

20      A.  No.

21      Q.  So a year and seven months after you

22   started with the Jefferson Parish Sheriff's

23   Office is when you first saw Tim Kemery;

24   correct?

25      A.  Okay.  Yeah.

DAVID B. HEINTZ                           April 30, 2019

169

1      Q.  That's correct; right?

2      A.  (Witness nodded head in the

3   affirmative.)

4      Q.  The opening paragraph seems to confirm

5   what you just said, that your captain felt there

6   has been changes in Deputy Heintz's performance

7   over the last few weeks.  His concern led him to

8   make a referral for evaluation and treatment.

9          Do you see that?

10     A.  Yes.

11     Q.  What was going on in the few weeks

12  before July 9th, 2018 that caused your

13  performance to change?

14     A.  Lack of sleep.  Like I said, I started

15  drinking more.  I was having these vivid, vivid

16  dreams; and it was really bothering me.  I was

17  concerned that, I guess, my tolerance level

18  would go down; and I would act out on the

19  street.  And that's not what I want to do.  I

20  don't want to be that dude on YouTube kicking

21  some guy in handcuffs.  I just -- like I said, I

22  was concerned because of the drinking part.  I

23  got two boys.

24     Q.  Do you attribute the drinking more and

25  not being able to sleep in June and July of 2018

DAVID B. HEINTZ                                    April 30, 2019

                                                              170

 1    with what happened at the Gretna Police

 2    Department a year-and-a-half earlier?

 3        A.   Yes.  The dreams -- most of the dreams

 4    involve Scott Vinson; and I would wake up just

 5    angry, gritting me teeth, sweaty.  Like I said,

 6    they were vivid.  I'd rather not talk about

 7    them.

 8             But it really bothered me.  So I figured

 9    if I drank more it help me sleep better.  So

10    hence, the more drinking to try to help me

11    sleep; but it didn't help.

12        Q.   The dreams that you're describing, they

13    just started developing in June and July of

14    2018?

15        A.   No, I had them before.  Just the graphic

16    and severity was getting worse and worse.  And,

17    I guess, because my wife does all the bills, I

18    don't pay attention.  You know, my checks go in

19    there.  I don't know what I make.  I don't know

20    anything.  You know, I just -- I work.

21             Well, it got to the point where I was

22    getting two days of details a month, you know.

23    That's a hell of a financial cut.  I didn't

24    realize it until we did our tax stuff and we sat

25    down and it was almost a 20- or 30,000 dollar

DAVID B. HEINTZ                                    April 30, 2019

171

1    deficit, if you look at the numbers from what we

2    gave the tax lady.  I was like, Jesus Christ, I

3    didn't know we were that bad off.  And then it

4    just kept going from there.

5           But to reach out to the doctor -- I had

6    already filed suit.  I didn't want to use that

7    as a crutch, because, you know, I don't want to

8    be that -- or I went to get help, because I

9    filed suit.

10          The dreams were really, really bad; and

11   I was concerned.

12       Q.  When you're saying this $20,000 deficit,

13   are you referring to the difference between the

14   $101,060 in your 2016 return and the $82,011 in

15   your 2017 return?

16       A.  Whatever it was.  Like I said, I know at

17   Gretna my end year check was 80-something

18   thousand.  With JP, when I looked, it was

19   50-something or 40-something thousand.  So, you

20   know, that's what I'm looking at.  And then,

21   like I said, we gave everything to the tax lady.

22   And normally we were getting 10,000 or 12,000

23   back every year.  Well, because I wasn't making

24   as much money, we got like -- I don't know if it

25   was 2,000 or 3,000 dollars back.  And normally,

172

1    we use that to pay my kids' tuition.

2            So now I'm backed up a hell of a lot

3    more than what I was working for Gretna for all

4    these years, you know.  So we struggle.  We

5    borrow money to pay for the bills and stuff like

6    that.

7        Q.  And I understand what you said, what you

8    gave to the tax people that prepared your tax

9    returns.

10           When we went through the income, the

11   details and the records from the sheriff's

12   office, and I calculated that together, that

13   came out to be $77,791.29.  Only a difference of

14   $5,000 between what you were making at the

15   Gretna Police Department.

16           So according -- I understand what the

17   tax lady says, but the documents that show the

18   income that you were bringing into your house

19   was only $5,000 less than what you were making

20   at Gretna.

21           Do you agree with that?

22            MS. McDANIEL McGEHEE:

23            Object to the form of the question in

24   that it depends on expert tax calculations that

25   you're not qualified to make.

DAVID B. HEINTZ                                    April 30, 2019

                                                          173

1              If you can agree with what he said

2        based on his calculations, go ahead.

3              THE WITNESS:

4              I can't.

5        BY MR. MAUTERER:

6          Q.  Gross income is gross income, no matter

7        what a tax person says.  Gross income whether or

8        not you can deduct it or not, it is what it is.

9        There's gross income of $77,000.

10             Can you explain -- you don't disagree

11       with me that there's $77,000 worth of gross

12       income in 2017; do you?

13             MS. McDANIEL McGEHEE:

14             I'm going to object to the form of the

15       question.  Again, it calls for calculation of

16       tax -- of gross income from calculations that

17       you did.

18       BY MR. MAUTERER:

19          Q.  You can still answer it, if you can.

20             MS. McDANIEL McGEHEE:

21             You can.  Right.  You can still answer

22       it, if you can.

23             THE WITNESS:

24             I don't know.

25       BY MR. MAUTERER:

DAVID B. HEINTZ                        April 30, 2019

174

1    Q.  Now, when we issued a medical request to

2  Dr. Kemery, we asked for your medical records

3  and any evidence of any money that you paid him.

4  We didn't get anything from Doctor or Counselor

5  Kemery regarding anything you paid him.

6        Are you aware if he was covered by

7  insurance?

8    A.  He's recommended through the sheriff's

9  office.  I don't -- that's between them.  I

10  don't know.

11    Q.  When you went to visit him, did you ever

12  have to write a check?

13    A.  No.

14    Q.  Did you pay him cash when you went to

15  visit him?

16    A.  No.

17    Q.  Did you put it on your credit card when

18  you went to visit him?

19    A.  No.

20        MR. MAUTERER:

21        Let's take a five-minute break.  Let me

22  consult with my client.  I may be done.

23        (Off the Record)

24        MR. MAUTERER:

25        Go back on the record.

DAVID B. HEINTZ                              April 30, 2019

175

1   BY MR. MAUTERER:

2       Q.   Mr. Heintz, I have no further questions

3   for you.  I appreciate your time here today.

4       A.   Okay.

5   EXAMINATION BY MS. McDANIEL McGEHEE:

6       Q.   Mr. Heintz, although I can ask you

7   questions off the record, I just wanted to

8   clarify a couple of things.

9            You were asked a whole lot of questions

10  about your taxes and gross pay, and I think you

11  alluded to this, but I want the record to be

12  clear.  You do have a tax preparer that prepares

13  all your taxes each year; is that correct, sir?

14            MR. MAUTERER:

15            Object to the form.

16            THE WITNESS:

17            Yes.

18  BY MS. McDANIEL McGEHEE:

19      Q.   And you're not a CPA or an accountant;

20  is that correct, sir?

21            MR. MAUTERER:

22            Objection, leading.

23  BY MS. McDANIEL McGEHEE:

24      Q.   You can answer.

25      A.   No, I'm not a CPA.

DAVID B. HEINTZ                          April 30, 2019

176

1      Q.   You're not a CPA.   You're not a tax

2  preparer of your own taxes for either of the

3  years that you were discussing with

4  Mr. Mauterer; is that correct?

5          MR. MAUTERER:

6          Objection, leading.

7          THE WITNESS:

8          Correct.

9  BY MS. McDANIEL McGEHEE:

10     Q.   All right.   Do you know if taxes or if a

11 1099 has to be issued for payments of less than

12 $400?

13          MR. MAUTERER:

14          Objection.   Asks for an expert opinion.

15  BY MS. McDANIEL McGEHEE:

16     Q.   You can answer.

17     A.   I don't know.

18     Q.   Let's see.   Mr. Mauterer asked you

19 several questions about the last set of -- I

20 think it's Exhibit 24 -- which were records from

21 an LCSW.

22          Have you ever seen Tim Kemery's LCSW

23 records prior to maybe preparing for your

24 deposition today?   Or have you ever seen these

25 records?

DAVID B. HEINTZ                                    April 30, 2019

177

1          MR. MAUTERER:

2          Objection, compound.

3          THE WITNESS:

4          Yes.

5    BY MS. McDANIEL McGEHEE:

6       Q.  In review of these records, does it

7    indicate to you throughout the records that --

8    I'll just give you an example at Page 5 -- it

9    says, He had to seek new employment and knew

10   that he would not be able to maintain his pay

11   status and could not advance for at least four

12   years.

13          The new employment that you had to seek

14   was a switch, a transfer from Gretna to JPSO?

15          MR. MAUTERER:

16          Objection, leading.

17          THE WITNESS:

18          Yes.

19   BY MS. McDANIEL McGEHEE:

20      Q.  It says, the next paragraph down, In

21   addition, he struggled with the knowledge that

22   he was and is criticized by others, especially

23   law enforcement professionals, in the former

24   department for the moral stand that he took.

25          The former department, would that be

DAVID B. HEINTZ                              April 30, 2019

                                                      178

1   Gretna?

2        A.  Yes.

3        Q.  Mr. Mauterer asked you several questions

4   during your deposition about speaking poorly of

5   others.

6            During your employment at Gretna would

7   you sometimes point out the procedure violations

8   or policy violations of others?

9        A.  Ask me again?

10       Q.  Yeah.  So what I'm trying to clarify is,

11  I don't think that there was ever a definition

12  of speaking poorly of others in front of your

13  people under your command.  Specifically, when

14  talking about Rodriguez or other members who you

15  might have had some sort of beef with.

16           When you were employed at Gretna, did

17  you speak out on policy violations or procedure

18  violations or other things that you thought were

19  illegal activities of Gretna during your

20  employment?

21           MR. MAUTERER:

22           Objection, compound.

23           THE WITNESS:

24           Yes.

25  BY MS. McDANIEL McGEHEE:

DAVID B. HEINTZ                              April 30, 2019

179

1       Q.   When you said by speaking poorly, I
2   think you answered the questions -- I objected
3   to the form -- but do you believe that you were
4   ever speaking poorly of others, or was it simply
5   that you were pointing out what you believe to
6   be policy/procedure or illegal acts of persons
7   at Gretna?
8              MR. MAUTERER:
9              Objection.  Compound, leading.
10             THE WITNESS:
11             That I was calling them out because
12  they were violating policies and -- that's it.
13  BY MS. McDANIEL McGEHEE:
14      Q.   Right.  I think that's everything.
15  Thank you.
16             (Deposition concluded at or about 1:35
17  p.m.)
18
19
20
21
22
23
24
25

DAVID B. HEINTZ                                April 30, 2019

180

1                    WITNESS' ATTESTATION

2              I have read or have had the foregoing

3       testimony read to me, pursuant to Rule 30(e) of

4       the Federal Rules of Civil Procedure and/or

5       Article 1445 of the Louisiana Code Civil

6       Procedure, and hereby attest that, to the best

7       of my ability and understanding, it is a true

8       and correct transcription of my testimony, with

9       the exception of any attached corrections or

10      changes, complete with reasons for changes, on

11      the Witness' Amendment Pages;

12             I have in no way altered the printed

13      transcript pages containing testimony herein,

14      tampered with the seal on the last numbered page

15      herein, or tampered with the security strip on

16      the binder hereof.  The integrity of this

17      certified transcript has been maintained in the

18      identical form as it was received by me, with

19      the exception of any changes on the Witness'

20      Amendment Pages.

21

22      - - - - - - - - - - - - -
        Date
23
                _____
24              DAVID B. HEINTZ
                (Signature)
25

DAVID B. HEINTZ                                    April 30, 2019

                                                              181

1                         REPORTER'S PAGE

2              I, KATHRYN L. KOVACEVICH, Certified Court

3        Reporter, Registered Professional Reporter, in

4        and for the State of Louisiana, the officer, as

5        defined in Rule 28 of the Federal Rules of Civil

6        Procedure and/or Article 1434(B) of the

7        Louisiana Code of Civil Procedure, before whom

8        this proceeding was taken, do hereby state on

9        the Record:

10             That due to the interaction in the

11       spontaneous discourse of this proceeding, dashes

12       (--) have been used to indicate pauses, changes

13       in thought, and/or talkovers; that same is the

14       proper method for a Court Reporter's

15       transcription of proceeding, and that the dashes

16       (--) do not indicate that words or phrases have

17       been left out of this transcript;

18             That any words and/or names which could not

19       be verified through reference material have been

20       denoted with the phrase "(spelled

21       phonetically)."

22

23                      _____
                        KATHRYN L. KOVACEVICH
24                      Certified Court Reporter
                        Registered Professional Reporter
25                      State of Louisiana

                 KAY E. DONNELLY & ASSOCIATES
                        504.299.8220